# MOORE *v.* ILLINOIS

No. 69–5001.   Argued January 18, 1972—Decided June 29, 1972

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, and REHNQUIST, JJ., joined. MARSHALL, J., filed an opinion concurring in part and dissenting in part, in which DOUGLAS, STEWART, and POWELL, JJ., joined, *post*, p. 800.

*James J. Doherty* argued the cause for petitioner. With him on the briefs was *Gerald W. Getty.*

*Thomas J. Immel,* Assistant Attorney General of Illinois, argued the cause for respondent. With him on the brief were *William J. Scott,* Attorney General, *Joel M. Flaum,* First Assistant Attorney General, and *James B. Zagel* and *Jayne A. Carr,* Assistant Attorneys General.

Briefs of *amici curiae* urging reversal were filed by *Elmer Gertz* and *Willard J. Lassers* for the American Civil Liberties Union, Illinois Division, et al., and by *Jack Greenberg, James M. Nabrit III, Jack Himmelstein,* and *Anthony G. Amsterdam* for the NAACP Legal Defense and Educational Fund, Inc., et al.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This state murder case, with the death penalty imposed by a jury, comes here from the Supreme Court of Illinois. The grant of certiorari, 403 U. S. 953 (1971), was limited to three of four questions presented by the petition. These concern the nondisclosure to the defense of allegedly exculpatory evidence possessed by the prosecution or the police; the admission into evidence of a shotgun that was not the murder weapon; and the rejection of eight veniremen who had voiced general objections to capital punishment. The first and third issues respectively focus on the application of *Brady* v.

*Maryland,* 373 U. S. 83 (1963), and *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968).

## I

Petitioner Lyman A. Moore was convicted in 1964 of the first-degree murder of Bernard Zitek. Moore's appeal to the Supreme Court of Illinois was held in abeyance while he petitioned the trial court for post-conviction relief. After a hearing in January 1967, that petition was denied. Moore's appeal from the denial was consolidated with his appeal from the conviction and sentence. With one justice dissenting and another not participating, the Illinois court affirmed the judgments. 42 Ill. 2d 73, 246 N. E. 2d 299 (1969).

## II

The homicide was committed on April 25, 1962. The facts are important:

A. The victim, Zitek, operated a bar-restaurant in the village of Lansing, southeast of Chicago. Patricia Hill was a waitress there. Donald O'Brien, Charles A. Mayer, and Henley Powell were customers.

Another bar called the Ponderosa Tap was located in Dolton, also southeast of Chicago. It was owned by Robert Fair. William Joyce was the bartender. One of Fair's customers was Virgle Sanders.

A third bar known as Wanda and Del's was in Chicago. Delbert Jones was the operator. William Leon Thompson was a patron.

The Westmoreland Country Club was in Wilmette, about 50 miles north of Lansing. The manager there was Herbert Anderson.

B. On the evening of April 25 Zitek was tending bar at his place in Lansing. Shortly before 10 p. m. two men, one with a moustache, entered and ordered beer. Zitek admonished the pair several times for using pro-

fane language. They continued in their profanity and, shortly, Zitek ejected them. About an hour later a man carrying a shotgun entered. He laid the weapon on the bar and shot and killed Zitek. The gunman ran out, pursued by patrons, and escaped in an automobile.

C. At the trial waitress Hill positively identified Moore as one of the two men ejected from the bar and as the one who returned and killed Zitek. She testified that she had a clear and close view from her working area at the bar and that she observed Zitek's ejection of the two men and the shotgun killing an hour later.

D. A second in-court identification of Moore as the man who killed Zitek was made by the customer Powell. Powell, who at the time was playing pinochle with others, testified that he observed Moore enter the bar with a shotgun and shoot Zitek; that after the shooting he pursued Moore; and that outside the bar Moore stopped momentarily, turned, and shouted, "Don't come any further or I'll shoot you, too."

E. Sanders testified that on April 27, two days after the murder, he was in the Ponderosa Tap and that a customer there, whom Sanders identified as "Slick," remarked to Sanders that it was "open season on bartenders" and that he had shot one in Lansing. At the trial Sanders identified Moore as the man who was in the Ponderosa Tap on April 27. Moore was with another man who had a moustache. The two asked for a ride to Harvey, Illinois. The owner, Fair, agreed to give them the ride.

F. Fair testified that Moore was one of the two men who requested and were given the ride; that during the journey one of them was referred to as "Barbee"; and that one said "something like, 'Well, if we hadn't had that trouble with the bartender in Lansing, we'd have been all right.'"

G. The Ponderosa bartender, Joyce, testified that San-

ders and Fair were in that tavern on April 27; that Moore was there at the same time; and that he arranged with Fair for Fair to give Moore and his companion a ride.

It is thus apparent that there were positive in-court identifications of Moore as the slayer by the waitress Hill and by the customer Powell, and that there were in-court identifications of Moore as having been present at the bar in Dolton two days later by Sanders, by Fair, and by Joyce.

H. Six months after the slaying, in the early morning hours of October 31, 1962, a Chicago police officer was shot at from a 1957 Ford automobile. Two men fled the scene. The police "staked out" the car, and several hours later Moore and a moustached man, later identified as Jerry Barbee, were arrested when they approached and entered the vehicle. The automobile proved to be owned by Barbee. A fully loaded sawed-off 16-gauge shotgun was in the car.[1] The shotgun was introduced in evidence at Moore's trial.[2] The State conceded that the gun so introduced was not the murder weapon, and that the State's ballistics technician, if called, would testify that the waddings taken from Zitek's body came, in his opinion, from a 12-gauge shotgun shell.

I. The defense called manager Anderson of the Westmoreland Country Club as a witness. He testified that Moore had been hired as a waiter there on April 24 (the day before the murder); that the club records indicated there was a special party at the club on the evening of April 25; and that Moore was paid for work-

---

[1] This early morning incident was recounted in an earlier trial of Moore and Barbee for an armed robbery at Harvey, Illinois, on July 27, 1962. *People* v. *Moore,* 35 Ill. 2d 399, 401–402, 220 N. E. 2d 443, 444–445 (1966), cert. denied, 389 U. S. 861 (1967).

[2] A revolver found at Moore's feet at the time of his arrest and a shoulder holster then on his person were ruled inadmissible.

ing until sometime between 10 p. m. and midnight. The club's bartender testified to the same effect. Each of these witnesses nevertheless admitted that he could not remember seeing Moore at the club that night, but said that he would have known if he had been absent for any substantial period of time. The club records also indicated that Moore worked at the club the afternoon of April 27, when, according to the testimony of Sanders, Fair, and Joyce, Moore was at the Ponderosa Tap in Dolton.[3]

J. O'Brien, a customer at Zitek's, testified for the defense that he observed Zitek eject two men the evening of the 25th, and that Moore was not one of them. Although he was in the restaurant at the time of the homicide, he did not see the person who shot Zitek. A police officer testified that in his opinion O'Brien was drunk at the time.

### III

Prior to the trial, the defense moved for disclosure of all written statements taken by the police from any witness. The State agreed to furnish existing statements of prosecution witnesses. At the post-conviction hearing, Moore argued, and the claim is presented here, that he was denied a fair trial because six items of evidence, unknown to him at the time of the trial, were not produced and, in fact, were suppressed by the State:

A. On April 30, 1962, Sanders gave a statement to the police that he had met the man "Slick" for the first time "about six months ago" in Wanda and Del's tavern. Testimony at the post-conviction hearing by Lieutenant Turbin of the Lansing Police Department revealed that at the time of trial the police possessed an FBI report

---

[3] A like alibi defense was submitted at the earlier armed robbery trial of Moore and Barbee. *People* v. *Moore*, 35 Ill. 2d, at 406, 220 N. E. 2d, at 447.

that Moore was in Leavenworth Penitentiary from 1957 to March 4, 1962. That report thus proved that Sanders could not have met Moore at Wanda and Del's in November 1961. The defense was not given a copy of the statement made by Sanders. The prosecuting attorney asserted at the post-conviction hearing that he did not recall having seen the statement before or during the trial.

B. On the day Sanders gave his statement, that is, on April 30, the police raided Wanda and Del's looking for "Slick." "Slick" was not there, but Jones, the tavern's operator, said that he could identify "Slick." After Moore was arrested, Jones was not asked by the police whether Moore was "Slick." The defense was not advised of the raid until after the trial. At the post-conviction hearing Jones testified that Moore was not "Slick." His testimony, however, was stricken on the ground that it pertained to innocence or guilt and was not admissible upon collateral review.

C. After the raid on Wanda and Del's, the police secured from their files a picture of James E. "Slick" Watts and assigned Lieutenant Turbin the task of finding Watts. His search was unsuccessful. Moore asserts that the attempt to find Watts was not made known to the defense until cross-examination of the Lansing police chief at the post-conviction hearing.

D. After Moore was arrested on October 31, he was photographed by the police. The photograph was shown to William Leon Thompson, the patron of Wanda and Del's. Thompson testified at the post-conviction hearing that he told Lieutenant Turbin that the picture "didn't, to the best of my knowledge, resemble the man that I knew" as "Slick." He identified a picture of Watts as "the Slick I know." Defense counsel testified that through the course of the trial neither the police

nor the prosecutor advised them about Thompson and his disclaimer.

E. At the start of the trial Sanders observed Moore for the first time since the alleged bragging incident at the Ponderosa Tap. Sanders remarked to the prosecuting attorney and to police officers who accompanied him into the courtroom that the person he knew as "Slick" was about 30–40 pounds heavier than Moore and did not wear glasses. One of the officers responded, "Well, you know how the jailhouse beans are." Moore contends that he and defense counsel were not advised of this remark of Sanders until after the trial had concluded.

F. Mayer, one of the card players at Zitek's at the time of the murder, gave the police a written statement. On the back of the statement Officer Koppitz drew a sketch of the seating arrangement at the card table. The diagram shows that the corners of the table pointed north, south, east, and west. Cardplayer Powell was placed on the southwest side. The bar was about 10 feet north of the table. The door was to the southwest. Moore argues that the diagram is exculpatory and contradicts Powell's testimony that he observed the shooting. Defense counsel testified that they were not shown the diagram during the trial.

Moore argues, as to the first five items, that the State did not comply with the general request by the defense for all written statements given by prosecution witnesses; that the State failed to produce the pretrial statement of Sanders and the other evidence contradicting Sanders' identification of Moore as "Slick"; and that the evidence not produced was material and would have been helpful to his defense.

The Illinois court held that the State had not suppressed material evidence favorable to Moore, that the

record shows that the prosecution presented its entire file to defense counsel, and that no further request for disclosure was made. 42 Ill. 2d, at 80–81, 246 N. E. 2d, at 304. Moore submits here the alternative claim that a specific request is not an "indispensable prerequisite" for the disclosure of exonerating evidence by the State and that the defense could not be expected to make a request for specific evidence that it did not know was in existence.

In *Brady* v. *Maryland,* 373 U. S. 83 (1963), the petitioner and a companion were found guilty by a jury of first-degree murder and were sentenced to death. In his summation to the jury, Brady's counsel conceded that Brady was guilty, but argued that the jury should return its verdict "without capital punishment." Prior to the trial, counsel had requested that the prosecution allow him to examine the codefendant's extra-judicial statements. Some of these were produced, but another, in which the codefendant admitted the actual homicide, was withheld and did not come to Brady's notice until after his conviction. In a post-conviction proceeding, the Maryland Court of Appeals held that this denied Brady due process of law, and remanded the case for retrial on the issue of punishment. This Court affirmed. It held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U. S., at 87.

The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favor-

able character for the defense, and (c) the materiality of the evidence. These are the standards by which the prosecution's conduct in Moore's case is to be measured.

Moore's counsel asked several prosecution witnesses if they had given statements to the police. Each witness (Hill, Powell, Fair) who had given a statement admitted doing so and the statement was immediately tendered. The same inquiry was not made of witness Sanders. He was the only state witness who was not asked the question. At the post-conviction hearing the inquiry was made. Sanders admitted making a statement to the police and the statement was tendered.

The record discloses, as the Illinois court states, 42 Ill. 2d, at 80, 246 N. E. 2d, at 304, that the prosecutor at the trial submitted his entire file to the defense. The prosecutor, however, has no recollection that Sanders' statement was in the file. The statement, therefore, either was in that file and not noted by the defense or it was not in the possession of the prosecution at the trial.

We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. Here, the elusive "Slick" was an early lead the police abandoned when eyewitnesses to the killing and witnesses to Moore's presence at the Ponderosa were found. Unquestionably, as the State now concedes,[4] Sanders was in error when he indicated to the police that he met Moore at Wanda and Del's about six months prior to April 30, 1962. Moore's incarceration at Leavenworth until March shows that conclusion to have been an instance of mistaken identity. But the mistake was as to the identification of Moore as "Slick," not as to

---

[4] Brief for Respondent 4; Tr. of Oral Arg. 28.

the presence of Moore at the Ponderosa Tap on April 27.[5] "Sanders' testimony to the effect that it was Moore he spoke with at the Ponderosa Tap in itself is not significantly, if at all, impeached. Indeed, it is buttressed by the testimony of bartender Joyce and operator Fair, both of whom elaborated the incident by their description of the man, and by Moore's request for a ride to Harvey, Illinois, Fair's providing that ride, and Fair's hearing, on that trip, the reference to one of the men as 'Barbee,' " and a second reference to trouble with a bartender in Lansing.

The other four of the first five items—that Jones told police he could identify "Slick" and subsequently testified that Moore was not "Slick"; that the police had a picture of Watts and assigned the lieutenant, unsuccessfully, to find Watts; that Thompson had been shown a picture of Moore and told the police that Moore was not "Slick"; and that on the day of the trial Sanders remarked that the man he knew as "Slick" looked heavier than Moore—are in exactly the same category. They all relate to "Slick," not Moore, and quite naturally go off on Sanders' initial misidentification of "Slick" with Moore.

None of the five items serves to impeach in any way the positive identification by Hill and by Powell of

---

[5] The dissent observes, *post*, at 804, "When confronted with this fact [Moore's imprisonment at Leavenworth], Sanders indicated that it was impossible that petitioner [Moore] was the man with whom he had spoken in the Ponderosa Tavern." This is a misreading of Sanders' testimony. The question and Sanders' answer were:

"Q. And did you tell me and also later on, did you tell the policeman from the State's Attorney's Office that if you had known that this fellow, Lyman Moore, was in the Federal Penitentiary until March 4, 1962, you would definitely not have identified him as being Slick that you knew?

"A. If he's in jail, it would have been impossible to be the same man." Abstract of Record 296.

Moore as Zitek's killer, or the testimony of Fair and Joyce that Moore was at the Ponderosa Tap on April 27, or the testimony of Fair that the moustached Barbee was accompanying Moore at that time, and that one of the two men made the additional and undisputed admission on the ride to Harvey. We conclude, in the light of all the evidence, that Sanders' misidentification of Moore as Slick was not material to the issue of guilt.

The remaining claim of suppression relates to the diagram on the back of Mayer's statement to the police.[6] Moore contends that the diagram shows that Powell was seated with his back to the entrance to Zitek's and, thus, necessarily contradicts his testimony that he was looking toward the entrance as he sat at the card table, and that the State knowingly permitted false testimony to remain uncorrected, in violation of *Napue* v. *Illinois,* 360 U. S. 264 (1959).

In *Napue* the principal prosecution witness at Napue's murder trial was an accomplice then serving a sentence for the crime. He testified, in response to an inquiry by the prosecutor, that he had received no promise of consideration in return for his testimony. In fact, the prosecutor had promised him consideration, but he did nothing to correct the witness' false testimony. This Court held that the failure of the prosecutor to correct the testimony, which he knew to be false, denied Napue due process of law, and that this was so even though the false testimony went only to the credibility of the witness. See

[6] Contrary to the assertion by the dissent that the Mayer statement, with its accompanying diagram, was never made available to the defense, *post,* at 803 and 809, the trial transcript indicates that during the cross-examination of Officer Koppitz a request was made by the defense for all written statements taken by the officer from persons in Zitek's restaurant at the time of the shooting. The court granted the request and the record recites that statements of Mayer and others were furnished to defense counsel.

also *Miller* v. *Pate,* 386 U. S. 1 (1967), and *Alcorta* v. *Texas,* 355 U. S. 28 (1957).

We are not persuaded that the diagram shows that Powell's testimony was false. The officer who drew the diagram testified at the post-conviction hearing that it did not indicate the direction in which Powell was facing or looking at the time of the shooting. Powell testified that his position at the table gave him a view of the bartender; that at the moment he could not bid in the pinochle game and had laid his hand down and was looking toward the door when Moore walked in. There is nothing in the diagram to indicate that Powell was looking in another direction or that it was impossible for him to see the nearby door from his seat at the card table. Furthermore, after the shooting he pursued Moore but stopped when the man warned him that he, too, might be shot.

In summary, the background presence of the elusive "Slick," while somewhat confusing, is at most an insignificant factor. The attempt to identify Moore as "Slick" encountered difficulty, but nothing served to destroy the two-witness identification of Moore as Zitek's assailant, the three-witness identification of Moore as present at the Ponderosa Tap, the two-witness identification of Moore as one of the men who requested and obtained a ride from the Ponderosa in Dolton to Harvey, Illinois, and Fair's testimony as to the admission made on that ride.

We adhere to the principles of *Brady* and *Napue,* but hold that the present record embraces no violation of those principles.

IV

The 16-gauge shotgun was admitted into evidence at the trial over the objection of the defense that it was not the murder weapon, that it had no connection with the crime charged, and that it was inadmissible under Illinois

law.[7]  During his closing argument to the jury, the prosecuting attorney stated that the 16-gauge shotgun was not used to kill Zitek,[8] but that Moore and his companion, Barbee, were "the kind of people that use shotguns." [9]

The Supreme Court of Illinois held that the shotgun was properly admitted into evidence as a weapon in Moore's possession at the time of his arrest, and was a weapon "suitable for the commission of the crime charged . . . even though there is no showing that it was the actual weapon used."   42 Ill. 2d, at 78, 246 N. E. 2d, at 303.   Moore claims that the gun's introduction denied him due process.

Of course, the issue whether the shotgun was properly admitted into evidence under Illinois law is not subject to review here.   The due process claim, however, appears to be raised for the first time before us.   There is no claim by Moore, and there is nothing in the record to disclose, that due process was argued in the state courts. We could conclude, therefore, that the issue is not one properly presented for review.

In any event, we are unable to conclude that the shotgun's introduction deprived Moore of the due process of law guaranteed him by the Fourteenth Amendment. The 16-gauge shotgun, found in the car, was in the constructive possession of both Moore and Barbee when they were arrested after the shooting incident on October 31.   There is substantial other evidence in the record

---

[7] See n. 2.

[8] Curiously, the State argues in this Court that it is possible that the 16-gauge shotgun was the murder weapon.   Brief for Respondent 20–21.

[9] Later in his closing argument the prosecuting attorney referred to the 16-gauge shotgun and stated again that a 12-gauge shotgun killed Zitek.   He argued that a shotgun is not "the most humane type weapon" and that the death penalty is appropriate in a case in which a shotgun is used to murder a person.

that a shotgun was used to kill Zitek, and that he suffered the wounds one would expect from a shotgun fired at close range. The testimony as to the murder itself, with all the details as to the shotgun wounds, is such that we cannot say that the presentation of the shotgun was so irrelevant or so inflammatory that Moore was denied a fair trial. The case is not federally reversible on this ground.

## V

Inasmuch as the Court today has ruled that the imposition of the death penalty under statutes such as those of Illinois is violative of the Eighth and Fourteenth Amendments, *Furman* v. *Georgia, ante,* p. 238, it is unnecessary for us to consider the claim of noncompliance with the *Witherspoon* standards. In *Witherspoon,* 391 U. S., at 523 in n. 21, the Court stated specifically "Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case" (emphasis in original). The sentence of death, however, may not now be imposed.

The judgment, insofar as it imposes the death sentence, is reversed, *Furman* v. *Georgia, supra,* and the case is remanded for further proceedings.

Mr. Justice Marshall, with whom Mr. Justice Douglas, Mr. Justice Stewart, and Mr. Justice Powell join, concurring in part and dissenting in part.

Petitioner was convicted of murder in the Illinois state courts and sentenced to death. The Supreme Court of Illinois affirmed the conviction and sentence by a divided court. 42 Ill. 2d 73, 246 N. E. 2d 299 (1969). This Court holds that the imposition of the death sentence violated the principle established today in *Furman* v. *Georgia, ante,* p. 238, and that the sentence must be vacated, but the Court upholds the underlying conviction. I agree with the majority that the sentence is invalid and

join Part V of the opinion of the Court.   I also agree that the introduction of the shotgun into evidence at petitioner's trial did not violate the Fourteenth Amendment.[1]

But, I believe that in failing to disclose to petitioner certain evidence that might well have been of substantial assistance to the defense, the State denied him a fair trial.

The opinion of the Court relates at some length the facts relating to the crime with which petitioner was charged, the circumstances of his arrest, the course of the trial, and the developments at the post-conviction hearing.   As these facts are complicated and quite confus-

---

[1] I find the constitutional question presented by the introduction of this evidence to be much harder than the majority seems to.   It was uncontradicted at trial that the weapon introduced against petitioner had no bearing on the crime with which he was charged. It was, in fact, clear that the shotgun admitted into evidence was a 16-gauge gun, whereas the murder weapon was a 12-gauge gun. Despite the fact that the prosecution conceded this in a pretrial bill of particulars, it did everything possible to obfuscate the fact that the weapon admitted into evidence was not the murder weapon. This was highly improper.   The record also indicates that the trial judge was confused as to why he thought the weapon should be admitted.   At one point he said, "There was testimony here that this was a shotgun killing.   And I can see nothing wrong if they say that this defendant, who will be identified by other people, was apprehended with this gun."   Abstract of Record (Abs.), 65.   If the trial judge meant to imply that because the crime was committed with a shotgun, it was sufficient to prove that the petitioner possessed *any* shotgun, whether or not it was the murder weapon, he surely erred.   But it is impossible to tell from the record in this case precisely what was intended, or whether the judge confused the jury when he admitted the weapon.   Although this highly prejudicial and irrelevant evidence was introduced, and although the prosecution did its best to lead the jury to believe that there was a relationship between the murder weapon and the shotgun in evidence, the fact that petitioner's counsel explained to the jury that the two weapons were not identical is, on the very closest balance, enough to warrant our finding that the jury was not improperly misled as to the nature of the evidence before it.

ing, I have not reiterated them here. Rather, I have emphasized those that seem to me to be particularly important and I have added several details that are omitted from the Court's opinion.

Two interrelated defenses were raised against the charge of murder—alibi and misidentification. Petitioner's theory of the case was that he was not at the scene when the murder was committed and that those witnesses who testified that they saw him there were confusing him with someone else.

Only two witnesses affirmatively asserted at trial that they saw the murder and that they could identify petitioner as the assailant. They were Patricia Hill, a waitress in the victim's bar, and Henley Powell, a customer. Aside from their testimony, the only other evidence introduced against petitioner related to statements that he allegedly made two days after the murder.

There is a problem with the eyewitness testimony of Powell that did not become apparent until the post-conviction hearing in the trial court. At trial he testified as follows:

> "The defendant (indicating) came into the tavern while I was at the table. I first saw him when he walked in the door with a shotgun. I was sitting at the table along the wall. I was facing where the bartender was standing and I also had a view of the man that walked in the door. I was looking to the west." Abs. 32.

But at the post-conviction hearing it was discovered that police officers who had investigated the murder possessed a statement by one Charles Mayer, who had been sitting with Powell at a table in the bar, which contained a diagram indicating that Powell was seated in a direction opposite that indicated in his trial testi-

mony. This diagram was never made available to defense counsel.[2]

Donald O'Brien, who had also been seated at Powell and Mayer's table, testified at trial and contradicted the testimony of both Powell and Patricia Hill. Although O'Brien admitted that he did not actually see the shooting because his back was to the bar, he was certain that petitioner was not the man who had been ejected from the victim's bar only an hour before the killing. O'Brien's testimony greatly undercut the apparent retaliatory motive that the prosecution attributed to petitioner.[3]

---

[2] It is true, as the Court states, that following the shooting Powell followed the assailant into the street, but it is also true that he never got closer than 50 to 60 feet of the murderer. Abs. 32. The strength of his testimony lay in the alleged opportunity he had for close observation of the murderer while the crime was committed.

Footnote 6 of the Court's opinion implies that during the trial the prosecution turned over Mayer's diagram to defense counsel. But there is absolutely no support for this implication in the record. While it is true that the diagram was drawn on the back of the original statement given by Mayer to the police, there is nothing to indicate that it was ever recopied and made a part of any reproductions of Mayer's statement. All indications are that it was not reproduced. At the post-conviction hearing the following testimony was adduced: the police officer who aided the prosecution at trial indicated that he had the original diagram in *his file*, Abs. 244–249; the two lawyers who had represented petitioner at trial both swore that they were given only Mayer's statement, not his diagram, Abs. 307, 328; and the prosecutor testified that he did not know for sure whether he gave the diagram to defense counsel, but that it was certain that he did not supply the diagram if it was not in his file. Abs. 324. Since the diagram was in the police officer's file, not the prosecutor's, it is clear that it was never made available to defense counsel, even though the prosecutor was aware of its contents. See *infra*, at 809.

[3] The Court asserts that O'Brien may have been drunk. His testimony at trial made it clear beyond doubt that when the victim ejected the man alleged to be the petitioner from the bar, this wit-

Because of the contradictory testimony of those persons who were present at the scene of the murder, the statements allegedly made by the petitioner after the crime were crucial to the prosecution's case. The key prosecution witness in this regard was Virgle Sanders. He testified that two days after the murder he was in the Ponderosa Tavern, that petitioner (whom he knew as "Slick") was there also, and that petitioner said "[s]omething about it's season or open season on bartenders or something like that." Abs. 44. The bartender also testified that he recognized petitioner as being present at the same time as Sanders. And the owner of the tavern stated that he gave petitioner and petitioner's friend a short ride in his automobile, at the end of which the friend mentioned something about "trouble with the bartender." Abs. 52.

After his trial and conviction petitioner learned that five days after the murder, Sanders gave a statement to the police in which he said that he had met "Slick" for the first time about six months before he spoke to him in the Ponderosa Tavern. As the Court notes, it would have been impossible for Sanders to have met the petitioner at the time specified, because petitioner was in federal prison at that time. At the post-conviction hearing, Sanders said that he was not positive when he first met the man known as "Slick," but that he definitely knew it was before Christmas 1961. Petitioner was not released from federal custody until March 1962. When confronted with this fact, Sanders indicated that it was impossible that petitioner was the man with whom he had spoken in the Ponderosa Tavern. Abs. 296. Sanders' trial identification was further impeached at the post-trial hearing by testimony that on

ness was perfectly sober. Later, especially after the killing, the witness drank heavily and became intoxicated. No one contradicted this at trial.

the day of trial he told police officers that petitioner was approximately 30 or 40 pounds lighter than he remembered "Slick" being. Abs. 294.

Sanders' testimony that petitioner and "Slick" were not one and the same was corroborated at the hearing. The reason that Sanders could remember the first time that he had met "Slick" was that "Slick" had been involved in a scuffle with one William Thompson. Thompson testified at the hearing that he remembered the altercation, that he knew "Slick," that prior to the trial he had told police officers that petitioner was not "Slick," and that he remained certain that petitioner and "Slick" were different people. Finally, Sanders' testimony was corroborated by Delbert Jones, the owner of the tavern where "Slick" and Thompson scuffled. Jones testified that he was certain that petitioner was not the man known as "Slick."

The fact is that Thompson and Jones were both familiar with one James E. Watts, whom they knew as "Slick," and who looked very much like the petitioner. The record makes clear that the police suspected Watts as the murderer and assigned a lieutenant to search for him. A raid of Jones' bar was even made in the hope of finding this suspect.

Sanders' testimony at the post-conviction hearing indicates that it was Watts who bragged about the murder, not petitioner. It is true that the bartender and the owner of the Ponderosa Tavern testified at trial that it was petitioner who was in the bar with Sanders, but the bartender had never seen "Slick" before, and the owner was drinking the entire afternoon. Furthermore, the fact remains that petitioner and Watts look very much alike.

Petitioner urges that when the State did not reveal to him Sanders' statement about meeting "Slick" at an earlier time and the corroborative statements of

Thompson and Jones, it denied him due process. The Court answers this by saying that the statements were not material. It is evident from the foregoing that the statements were not merely material to the defense, they were absolutely critical. I find myself in complete agreement with Justice Schaeffer's dissent in the Illinois Supreme Court:

> "The defendant's conviction rests entirely upon identification testimony. The facts developed at the post-conviction hearing seriously impeached, if indeed they did not destroy, Sanders's trial testimony. Had those facts, and the identifications of 'Slick' Watts by Thompson and Jones, been available at the trial, the jury may well have been unwilling to act upon the identifications of Patricia Hill and Henley Powell. Far more is involved in this case, in my opinion, than 'the following up of useless leads and discussions with immaterial witnesses.' Certainly if Sanders's identification was material, the . . . testimony of the other witnesses which destroyed that identification [was] also material. Consequently, I believe that the State's nondisclosure denied the defendant the fundamental fairness guaranteed by the constitution. . . ." 42 Ill. 2d, at 88–89, 246 N. E. 2d, at 308.[4]

---

[4] Chief Judge Friendly has noted that when the prosecution fails to disclose evidence whose high value to the defense could not have escaped the prosecutor's attention, "almost by definition the evidence is highly material." *United States* v. *Keogh*, 391 F. 2d 138, 147 (CA2 1968). See also *United States ex rel. Meers* v. *Wilkins*, 326 F. 2d 135 (CA2 1964).

The materiality of the undisclosed evidence in this case cannot be seriously doubted. The State based its case primarily on the eyewitness identifications of petitioner by a witness and patron in the bar. Testimony of this sort based on in-court identification is often viewed with suspicion by juries. See McGowan, Constitutional In-

Petitioner also urges that the failure of the prosecution to disclose the information concerning where the eyewitness Powell was sitting when he allegedly saw petitioner is another instance of suppression of evidence in violation of the Fourteenth Amendment. Had this been the prosecution's only error, I would join the Court in finding the evidence to be immaterial. But if this evidence is considered together with other evidence that was suppressed, it must be apparent that the failure of the prosecution to disclose it contributed to the denial of due process.

Even if material exculpatory evidence was not made available to petitioner, the State argues that because petitioner did not demand to see the evidence, he cannot now complain about nondisclosure. This argument is disingenuous at best.

Prior to trial, petitioner moved for discovery of all statements given to the prosecutor or the police by any witness possessing information relevant to the case. Abs. 5. In explaining why such a broad motion was made, petitioner's counsel stated that, "We want to circumvent the possibility that a witness gets on the stand and says, 'Yes, I made a written statement,' and then the State's Attorney says, 'But no, we don't have it in our possession,' or they say, 'It's in the possession of Orlando Wilson [Superintendent of Police, Chicago, Ill.],' or 'The Chief of Police of Lansing.' " Abs. 8. In

terpretation and Criminal Identification, 12 Wm. & Mary L. Rev. 235, 241–242 (1970). That testimony in this case was subject to serious question: indeed, petitioner premised his defense in large part on a theory of misidentification. Coupled with the contradictory statement made by O'Brien (see *supra,* at 803), the evidence showing that one of the witnesses may not have had an adequate opportunity to observe and that petitioner may have been confused with another person named "Slick" would certainly have been material to the defense's presentation of its case.

response to the motion, the prosecutor guaranteed defense counsel and the court that he would supply defense counsel with statements made either to the police or to the State's Attorney by witnesses who were called to testify at trial. *Ibid.* Based on this representation, the motion for discovery was denied. Never was there any implication by the prosecutor that his guarantee was in any way dependent upon petitioner's making repeated and specific requests for such statements after each witness testified at trial. The prosecutor's guarantee certainly covered Sanders' statement. As for the statements of the bartender and owner of the Ponderosa Tavern and the statement and diagram of Charles Mayer, petitioner clearly demanded to see these things before trial. The prosecution took the position that it was bound to reveal only the statements of witnesses who testified. Hence, it is hard to imagine what sort of further demand petitioner might have made. Moreover, the very fact that petitioner made his motion for extensive discovery placed the prosecution on notice that the defense wished to see all statements by any witness that might be exculpatory. The motion served "the valuable office of flagging the importance of the evidence for the defense and thus impos[ing] on the prosecutor a duty to make a careful check of his files." *United States v. Keogh,* 391 F. 2d 138, 147 (CA2 1968).

In my view, both *Brady* v. *Maryland,* 373 U. S. 83 (1963), and *Napue* v. *Illinois,* 360 U. S. 264 (1959), require that the conviction in this case be reversed. *Napue* establishes that the Fourteenth Amendment is violated "when the State, although not soliciting false evidence, allows it to go uncorrected." *Id.,* at 269. And *Brady* holds that suppression of material evidence requires a new trial "irrespective of the good faith or bad faith of the prosecution." *Supra,* at 87. There can be no doubt that there was suppression of evidence by the State and

that the evidence that the State relied on was "false" in the sense that it was incomplete and misleading.

Both before and during the trial the prosecutor met with Sanders and went over the statement that he had given the police five days after the murder. Abs. 301, 315. Thus, it is apparent that the prosecutor not only knew of the statement, but was actively using it to prepare his case. There was also testimony at the post-conviction hearing from the prosecution that it had discussed the location where Powell was sitting when he allegedly saw the murder. While the prosecutor could not remember whether or not he actually had Mayer's statement and diagram in his possession, he had some recollection that before trial he was informed of exactly where everyone at Powell's table was sitting. Abs. 323. No attempt was ever made at trial to communicate this information to the defense.

Moreover, seated at the prosecutor's table throughout the trial was Police Lieutenant Turbin, who had investigated the case and who was assisting the prosecution. At the post-conviction hearing, he testified that throughout the trial he was not only aware of Sanders' statement and Mayer's diagram, but also that he had them in his file. He made no attempt to communicate his information to the prosecutor or to remind him about the evidence.

When the State possesses information that might well exonerate a defendant in a criminal case, it has an affirmative duty to disclose that information. While frivolous information and useless leads can be ignored, if evidence is clearly relevant and helpful to the defense, it must be disclosed.

Obviously some burden is placed on the shoulders of the prosecutor when he is required to be responsible for those persons who are directly assisting him in bringing an accused to justice. But this burden is the essence

of due process of law. It is the State that tries a man, and it is the State that must insure that the trial is fair. "A citizen has the right to expect fair dealing from his government, see *Vitarelli* v. *Seaton,* 359 U. S. 535, and this entails . . . treating the government as a unit rather than as an amalgam of separate entities." *S&E Contractors, Inc.* v. *United States,* 406 U. S. 1, 10 (1972). "The prosecutor's office is an entity and as such it is the spokesman for the Government." *Giglio* v. *United States,* 405 U. S. 150, 154 (1972).[5] See also *Santobello* v. *New York,* 404 U. S. 257, 262 (1971) ; *Barker* v. *Wingo,* 407 U. S. 514 (1972).

My reading of the case leads me to conclude that the prosecutor knew that evidence existed that might help the defense, that the defense had asked to see it, and that it was never disclosed. It makes no difference whatever whether the evidence that was suppressed was found in the file of a police officer who directly aided the prosecution or in the file of the prosecutor himself. When the prosecutor consciously uses police officers as part of the prosecutorial team, those officers may not conceal evidence that the prosecutor himself would have a duty to disclose. It would be unconscionable to permit a prosecutor to adduce evidence demonstrating guilt without also requiring that he bear the responsibility of producing all known and relevant evidence tending to show innocence.

---

[5] In the recent decision in *Kastigar* v. *United States,* 406 U. S. 441 (1972), holding that use immunity was co-extensive with the Fifth Amendment privilege against self-incrimination, the Court noted that prosecutors may be responsible for actions of police officers enlisted to aid a prosecution.