*United States v. Russo,* 1 M.J. 134 (C.M.A. 1975).

## UNITED STATES

v.

## Master Sergeant Leroy J. GROOTHOFF, FR 391–38–5211, United States Air Force.

## ACM 23063.

U. S. Air Force Court of Military Review.

Sentence Adjudged 5 Sept. 1980.

Decided 29 July 1981.

Appellate Counsel for the Accused: Colonel George R. Stevens, Captain J. Laurens Tullock and Captain William G. Connelly, USAFR.

Appellate Counsel for the United States: Colonel James P. Porter and Captain Michael J. Hoover.

Before ARROWOOD, MAHONEY and MILLER, Appellate Military Judges.

## DECISION

MILLER, Judge:

Tried before a court-martial of members, at McGuire Air Force Base, the accused, a master sergeant with 20 years service, was convicted contrary to his pleas of wrongfully disposing of government property, accepting personal services for the disposition of such property, and receiving stolen property, in violation of the Uniform Code of Military Justice, Articles 108 and 134, 10 U.S.C.A. §§ 908 and 934. The approved sentence consists of a bad conduct discharge, confinement at hard labor for twelve months, forfeiture of $200.00 per month for twelve months and reduction to grade E–6.

Our examination of the record of trial, the assignment of errors and the government's reply thereto, convinces us that there was insufficient evidence to establish the accused's guilt of receiving stolen property.[1] Consequently, we set aside Additional Charge II and its specification.

While we conclude that all other findings are correct in law and fact, one particular assertion of error warrants detailed discussion; namely, the defense assertion that the government's failure, prior to trial, to disclose requested evidence useful to the defense, *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), denied due process and dictates reversal. We disagree.

The defense supports this claim by alleging that following their timely request for "any evidence of an exculpatory nature or which tends to negate the alleged guilt of the accused," the prosecution came into constructive possession of such evidence. Defense asserts such evidence, if presented at trial, would have created a reasonable doubt as to the accused's guilt of all remaining specifications. Hence, they claim the mandate of *Brady v. Maryland, supra*, was violated and request the remaining findings of guilty be set aside.

We address *first* the question of whether the prosecution constructively possessed this evidence and *second*, whether such evidence, if communicated to the fact-finder would have created a reasonable doubt as to the accused's guilt with respect to any remaining offenses.

### I

To determine whether the prosecution possessed undisclosed *Brady* material requires consideration of the Air Force Office of Special Investigations' (OSI) pre-trial in-

---

1. The only evidence that the property was "stolen" was the fact that title to the property still rested in the alleged thief's employer. The employer's failure to acknowledge the property as stolen, and his continued employment of the alleged thief, when combined with that alleged thief's denial of intent to steal and insistance that a pre-occupation with family problems resulted in her failure to begin a payroll deduc-tion which would have legitimatized the taking under an applicable employee's benefit program, create reasonable doubt as to whether the property was indeed stolen. Since one element of the offense of receiving stolen property requires that the property received be in fact stolen, the charge and the specification must fall.

vestigation into the accused's activities at McGuire AFB, New Jersey.

The official investigation into the accused' activities bore not only the accused's name in its title block, but also the name of two other subjects, both of whom, coincidently, testified at the accused's trial. One, an NCO, had been tried and convicted in mid-June 1980 based upon evidence stemming from this investigation, and the other, a Mr. M., while not under indictment, was still the subject of active investigative activity.

Another OSI investigation, entitled "Improper Procurement Activities Concerning Administration of GSA Service Contract with . . . [a civilian company owned by Mr. M.] . . .", collaterally examined contractual aspects of that company's irregular relationships with military personnel pursuant to an existing General Services Administration (GSA) contract at McGuire AFB, New Jersey.

As a result of allegations elicited in an interview conducted as a part of the latter investigation, the commander of the accused's unit at the time the accused was first assigned to McGuire Air Force Base, a Lt. Colonel S., was interviewed as a suspect in offenses similar to those for which the accused was about to be tried. That interview, conducted on 7 August 1980 at Wright-Patterson Air Force Base, Ohio, the base to which Lt. Colonel S. was then currently assigned, resulted in a signed sworn statement, exculpatory in nature, which included the phrase:

> I have no knowledge of the . . . (civilian company owned by Mr. M.) . . . . obtaining parts from McGuire. I am aware that honest borrowing of parts sometimes took place, usually to the advantage of McGuire.

In a subsequent unsworn verbal statement, Lt. Colonel S. added that the "borrowing" mentioned in his written statement referred to a practice in which Mr. M's

company lent parts to the accused's shop which were later replaced by parts that shop obtained through Air Force supply channels. Lt. Colonel S. also indicated that he knew all three subjects of the investigation bearing the accused's name.

A message summarizing this information and referencing both the investigation concerning Mr. M.'s company and the investigation referencing Mr. M., himself, was then sent from the interviewing OSI detachment in Ohio to the controlling OSI detachment at McGuire Air Force Base, New Jersey. The message was dated 20 August 1980.

Five days later, the staff judge advocate (SJA) at McGuire, attended a staff meeting at which the key elements of this message were briefed by that base's OSI detachment commander. Sometime subsequent to this briefing, a decision was made within OSI to include portions of material from that message in the published reports of both investigations. Final publication of these reports occurred on 22 and 23 September 1980. A copy of the report pertaining to Mr. M. still bearing the accused's name in its subject block,[2] was immediately forwarded by the SJA to counsel for the accused. The accused's trial had already taken place, his sentence having been announced on 6 September 1980.

The information communicated to the base SJA by the OSI detachment commander at the referenced briefing, logically related, not to an investigation of the accused, whose investigation should have already terminated, but rather, to ongoing investigations into the contract activities of Mr. M.'s company and of Mr. M., himself. Consequently we are not surprised by the SJA's failure to recognize such information as potentially relevant to a tangential theory later developed by the defense at trial, nor do we ascribe any improper motives to the SJA's failure to pass that information along to the defense.

2. Where, as here, investigations into the activities of several individuals are carried out under one multi-subject investigation, simple administrative procedures exist to delete the names of individual subjects as soon as sufficient information is gathered to resolve the allegations against them.

■ Nevertheless, from our reading of the federal cases interpreting *Brady v. Maryland, supra,* we conclude that good faith on the part of an SJA will not excuse his delay in transmitting such information. To the contrary, *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) and *United States v. Auten,* 632 F.2d 478 (5th Cir. 1980), clearly establish the principle that when information properly requested by an accused prior to trial is in the hands of any government agent conducting an investigation bearing the accused's name, it is constructively in the hands of government trial counsel and subject to a *Brady* motion.

■ This principle of constructive possession has never actually been applied to the military justice system, however, and we need not decide its applicability today[3]. This is so because military case law *has* incorporated the federal concept that when a defense request for evidence is a general one, suppressed evidence must "create a reasonable doubt that did not otherwise exist" before it violates due process and necessitates reversal, *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *United States v. Brickey,* 8 M.J. 757 (A.C.M.R.1980). Here, the allegedly sup-

3. If we were to apply the doctrine of constructive possession we would initially rest our decision to do so on two presumptions: first, that the purpose of criminal investigation is to develop evidence that establishes a suspect's guilt or innocence of a crime; and second, that a military staff judge advocate would not recommend referral of court-martial charges against a suspect until he is personally convinced that the criminal investigations upon which such charges are based have developed sufficient information to establish the suspect's guilt at court-martial.

Granting these presumptions, it follows that the purpose of a criminal investigation is ordinarily satisfied at the point court-martial charges are referred to trial. Hence unless a newly designated trial counsel desires to strengthen his case by the acquisition of additional evidence, he ordinarily should request termination of further investigation upon receipt of a case. If, whether through inadvertence or design, he failed to terminate such an investigation, evidence would continue to be sought and any subsequently developed evidence would continue to be brought to his attention.

pressed evidence creates no such reasonable doubt.

## II

■ According to the defense's brief, their basic theory at trial was that the accused did no more than carry out a "well established method of dealing with . . . (Mr. M.'s company) . . . which benefitted McGuire Air Force Base and which was at least tacitly supported by the key managers." Any "exchange or trading of items was not done for motives of personal gain on Groothoff's part but rather to keep a high in-commission rate on the machinery and equipment over which Groothoff's shop had responsibility."

This theory was supported in the record by a portion of:

(1) the defense's opening statement,

Master Sergeant Groothoff is a mission-oriented individual. He has a job and that is to keep equipment at a high in-commission rate and he did that by engaging in these swapping mechanisms and by engaging in keeping an active rathold inventory;

(2) the testimony of Mr. M.,

Presumably, government trial counsel would use any evidence obtained as a result of such a continuing investigation to establish the accused's guilt. So, the defense should be entitled to use similarly developed evidence that tends to establish the accused's innocence.

There is, of course, a unique problem in attempting to apply this federal court concept to the military justice system; to wit: in criminal cases, military investigators work for the commander and not the government trial counsel. Consequently, government trial counsel has no direct access, at least officially to OSI. Rather, communications to and from OSI are conducted through the commander and his staff judge advocate. The trial counsel does not have the authority to initiate or terminate such an investigation. Nevertheless, trial counsel may make appropriate recommendations to continue or terminate ongoing investigation.

If any investigation bearing the accused's name, or related to the accused's case, remains open at the time of trial, the trial counsel should ensure that any existing material requested pursuant to *Brady* is made available to the defense.

There have been times when on a Thursday night or a Friday night and they would need a seal or a spindle or a belt crank and they did not want any VDP's (vehicles down for parts) and since we were all supposed to be helping each other I would give them a part and they would not have any VDP's and would get their vehicle fixed and when they got the part they would return it back to me;

and (3) the testimony of the accused,

Q. Sergeant Groothoff, during the period that you were in charge of the 463L shop, did you ever trade parts with Mr. M...?

A. Yes, Sir.

Q. What were the circumstances of these trades?

A. Circumstances was, if we had a vehicle down we tried to repair the vehicle to keep them in commission so Aerial Port could do their job.

Q. How many times did these trades occur?

A. I'd say during the time I was the supervisor there, probably about 50 or 60 different occasions.

Q. Was any one party to the trade unfairly penalized by the parts traded?

A. No, sir.

\* \* \* \* \* \*

Q. When you were exchanging parts with (Mr. M.) did you feel that you were ever doing anything wrong?

A. No, sir.

\* \* \* \* \* \*

Q. Why do you have these beliefs?

A. Because it had been going on in the past before I even arrived on this station and I was carrying on like they were normally doing and I presumed it was all right.

Summarizing, the defense asserts, that if the accused had been provided with the results of OSI's interview of his former squadron commander, that commander would have testified on their behalf at trial. His additional testimony on the subject, "coming from a high ranking officer and commander, would have provided powerful support and enhanced credibility to" their basic defense theory and "would have tipped the scales in favor of the accused—it would have created a reasonable doubt."

Our own review of the record leads us to a contrary conclusion. The "suppressed" evidence supported only uncontested assertions of both Mr. M. and the accused that since prior to the accused's arrival on base there had been a technically unauthorized, but nevertheless accepted, on-going practice under which Mr. M.'s company would lend minor vehicle parts to the accused's shop for the purpose of expediting that shop's repair of government vehicles, and the shop would subsequently replace these parts via requisition from Air Force supply channels.

We conclude that such "suppressed" evidence was totally unrelated to the contested issues at trial. Instead those issues were whether large quantities of government vehicle parts other than those replacing parts previously lent to the government by Mr. M.'s company, were transferred by the accused to Mr. M. or his company, (Charge I), and then, if so, whether such parts were transferred as a part of a corrupt exchange for personal services of some value. (Charge II). We find that the overwhelming evidence with respect to both these contested issues established the accused's guilt beyond a reasonable doubt.[4]

Reassessing the sentence in light of the dismissal of Additional Charge II and its Specification, and on the basis of the entire record, we find the approved sentence nonetheless appropriate.

Accordingly, the findings of guilty as modified and the sentence are

AFFIRMED.

4. This included the testimony of numerous witnesses that far larger quantities of vehicle parts were transferred to Mr. M.'s company than were received by the government. Mr. M. admitted to a portion of these additional transfers, claiming that they were made with the accused's knowledge for use in the repair of government vehicles and that the government was credited for the parts so furnished. The accused, himself, denied any knowledge of any transfers other than those for the replacement of parts previously borrowed.