471 A.2d 327

Don J. PEOPLES

v.

STATE of Maryland.

No. 590, Sept. Term, 1983.

Court of Special Appeals of Maryland.

Feb. 10, 1984.

Certiorari Denied June 7, 1984.

Mark Colvin, Assigned Public Defender, with whom was Alan H. Murrell, Public Defender, on brief, for appellant.

Valerie V. Cloutier, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's

Atty. for Baltimore City and Ilene J. Nathan, Asst. State's Atty. for Baltimore City, on brief, for appellee.

Submitted before GILBERT, C.J., and ALPERT and BELL, JJ.

BELL, Judge.

Don J. Peoples, appellant, was convicted by a jury in the Circuit Court for Baltimore City of first degree murder and using a handgun in the commission of a felony. He was sentenced to life imprisonment for first degree murder. He was sentenced to five years for the use of the handgun to be served concurrently. In this appeal he poses the following question:

"Did the State's suppression of exculpatory evidence deny Peoples due process of law?"

Since we find the State did not suppress exculpatory evidence, our answer is in the negative.

## THE FACTS

On October 16, 1982, at about 10:00 p.m. in the 2300 block of Nevada Street in Baltimore City, Elwood Blackstone was shot and killed. He died of three gunshot wounds in the head.

India Noakes, the victim's fifteen year old girl friend, was on her porch at 2342 Nevada Street when she saw a man whom she identified as Peoples "peeping around the corner" while the victim was talking to someone in a Volkswagen. She saw no one with Peoples. A few seconds later, she heard three shots. Noakes did not see who shot the victim.

Bronte Bailey, age twenty, was sitting in a Volkswagen waiting for her cousin. Bailey testified that she and the victim sat in the car and talked for about five minutes. When her cousin came out of the house and got in the car, the victim got out of the car and stood next to it. Bailey heard a "pop sound" and saw a man, whom she identified as Peoples, standing alone with a gun in his hand. Her cousin

immediately drove away. Bailey testified she heard only two shots and that the second shot was not fired until one or two minutes after the first shot.

Linwood Walker recounted that he was in a car with Anthony Blackstone, who was the victim's brother, and Albert Fields. Walker, Blackstone, and Fields related to the jury that while they were riding in Blackstone's car, they saw someone lying in the street. When they drove around the block, they saw Peoples walking "rather fast" with two other men. On cross-examination, Blackstone identified the two men as "Nate" and "Squirrel", and stated that on the night of the shooting, he told a police officer about them.

Several days earlier, the victim had defeated Peoples in a fist fight. Blackstone informed the jury that after the fight, Peoples told the victim that "he was going to get him some way or another."

Peoples denied any involvement in the shooting and stated that on the night in question he was at home with his wife, his brother, and his sister-in-law. His testimony was corroborated by each of them.

In rebuttal, the State called Yvonne Willis. From her house at 2338 Nevada Street, Willis heard a shot and saw a man, whom she had never seen before, standing alone in front of a tree looking down at a body. After hearing two more shots, Willis fled. When asked if she saw that man in the courtroom, Willis stated that Peoples "favors" him.

The jury convicted Peoples of first degree murder and use of a handgun in the commission of a felony.

After the trial was completed, Peoples filed a Motion for a New Trial contending that the State had suppressed material and exculpatory evidence and thus denied him due process of law.

At the hearing, certain uncontradicted facts were adduced. It was admitted that upon securing a warrant, Detective Terrence McLarney went to Peoples' residence but did not locate him. He next went to the home of Nathaniel Collins to look for Peoples. He was directed there by the

brother of the victim, who told him "that's one of the guys who's good buddies with the man that killed my brother." McLarney did not know whether Collins was "Nate" nor did he inquire. McLarney did agree that "Squirrel" and "Nate" were mentioned to him by Anthony Blackstone. McLarney said he never pursued the matter because the witnesses told him that one man, Peoples, did the shooting. McLarney did ask Collins where he had been the night of the murder. He said Collins told him he had been to "several locations". Collins testified he had been to "Gentlemen's 10". Collins denied seeing Peoples that night. No written statement was taken from Collins.

Nathaniel Collins is known as "Nate" and one Bruce Whittington is known as "Squirrel". These men worked with Peoples. There is no evidence whether the police checked Collins' alibi. There is no evidence they even attempted to locate Whittington.

The prosecutor admitted that on the day of trial it did occur to her that Nathaniel Collins might be the "Nate"; therefore, she wrote in the name and address of Collins for voir dire purposes. During the trial, defense counsel did learn that Nate and Squirrel worked with Peoples. He made no further inquiry. The motion for a new trial was denied.

## THE LAW

Peoples relies on the following reasoning: the State knew the whereabouts of a witness helpful to him and failed to disclose it, *Regle v. State,* 9 Md.App. 346, 264 A.2d 119 (1970), that the suppression of material evidence exculpatory to him is a denial of due process, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that when a specific request is made for the specific evidence which is withheld the conviction must be set aside if the evidence "might have affected the outcome of the trial". *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Peoples goes on to say that in this case there was

more than passive non-disclosure and cites the closing argument of counsel.

The Supreme Court held in *Brady v. Maryland, supra,* 373 U.S. at page 87, 83 S.Ct. at page 1196 that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecutor."

The Supreme Court in *Moore v. Illinois,* 408 U.S. 786, 794, 92 S.Ct. 2562, 2567, 33 L.Ed.2d 706 (1972), refined the *Brady* holding, stating:

> The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.

The Supreme Court dealt with this issue again in *United States v. Agurs, supra,* and set forth the three situations in which the Brady rule usually arises: (1) when the State's case includes perjured testimony and the State knew or should have known of the perjury, (2) where there is a request for specific evidence which is withheld or suppressed, and (3) where there is a general request or no request for exculpatory material. In the first two situations the conviction must be set aside if the perjury or omitted evidence might have affected the outcome of the trial. In the third situation the conviction must be set aside "if the omitted evidence creates a reasonable doubt that did not otherwise exist." 427 U.S. at 112, 96 S.Ct. at 2401.

At the trial Peoples' position was that the State was required to give him the information about Nate because Rule 741 requires that the information be furnished. Peoples now claims he made a specific request for that information. He states that request was made to the prosecutor at

the beginning of voir dire. Unfortunately, we are not provided with a transcript of that conversation, but we do have the following colloquy between Quisgard, counsel for Peoples, and the Court at the hearings subsequent to the trial.

MR. QUISGARD: ... [Reading from Blackstone's testimony]. 'When did you tell these two police officers about Nate and Squirrel? The same night the incident occurred. Was it on the street or in the police station? In the police car. You told them about those two names? Yes. Did you also tell them about Jerome? I sure did.'

Now, Your Honor, Rule 741 requires that any information, even without a request for discovery, known to the State which would tend to exculpate a defendant is required to be given to me. Certainly where three people are identified as leaving the scene of a first degree murder and their names are given to the police and the police investigate Nathaniel Collins who turns out to be Nate which we didn't learn until two weeks after the trial, then the State was duty-bound to give us the information.

Had I before the jury had not only my client and his family and his relatives but also Nathaniel Collins and Bruce Whittington who is Squirrel, who is outside too, who was never even interviewed by the police—had I been able to put them on the stand and say gentlemen, were you with this man because people have identified you as being there, that would have been information the jury would have been entitled to very much within *Astin v. State* where they said a description also possibly different from that of the appearance of the appellant himself—and they went on to say we were entitled to have that information, the jury was entitled to know it.

Aggravating the situation very much, the State filed answers to discovery and they filed supplemental answers. They never told me about Nathaniel Collins even though they had known about him since they were looking to arrest this man and knew he had a good alibi. Just as we began the trial—

THE COURT: Back up a little bit. You say the State knew about Nathaniel Collins.

MR. QUISGARD: Certainly the police did and I am prepared to show the State did too.

THE COURT: The State knew about him, the State did and never told you about him.

MR. QUISGARD: That's right.

THE COURT: And they knew that he would furnish an alibi to each defendant?

MR. QUISGARD: They knew he would furnish his own alibi that says no, I was not with Romie, although all these witnesses say the three were together.

THE COURT: Well, assuming one of the witnesses said that it was Nate and Squirrel and assuming that the police had interviewed Nathaniel Collins and he, Nathaniel Collins, had said I wasn't there—

MR. QUISGARD: That's right.

THE COURT: You would have to establish a number of things, wouldn't you, it would seem to me. First of all, the witness who testified who said Nate and Squirrel were there—

MR. QUISGARD: Yes.

THE COURT: And definitely was there.

MR. QUISGARD: Were running together.

THE COURT: What you are saying is if this were known to you that one of these people, Nathaniel Collins, who said he wasn't there, that information was important to you so you would be able to at least impeach, if nothing else, the testimony of Blackstone.

MR. QUISGARD: Indeed. That was some of the most damaging testimony. Mr. Blackstone testified rather extensively on cross-examination to his accurate identification including descriptions of clothing, color hat, size and everything else.

THE COURT: Did you ever ask the State when you got this information through cross-examination does the State have any information who these two people are?

MR. QUISGARD: No, I didn't because where—In twenty-two years of practice in criminal law when three people leave a body at a first degree murder they all three get charged. I assumed they couldn't find them. All they knew was Nate and Squirrel.

THE COURT: Yeah, but my question was—You did not ask the police and the—

MR. QUISGARD: No, I didn't, but Rule 741 requires the State to have volunteered the information. Furthermore, Nate was interviewed before the defendant was arrested and, as the Court will recall, in a little memorandum insofar as the effect it may have on the right of the accused to a fair trial we see no basic distinction between evidence the State wilfully fails to disclose and that withheld because of an erroneous evaluation, and they talk about a description in the Austin case that was at variance and how important it was, not necessarily that it would change the result of the trial but that the defendant in the pursuit of a fair trial was entitled to have that information.

Now, what bothers me even more is that the State wrote down Nathaniel Collins in hand pen writing on the voir dire and when I asked her who Nate was the State continued to be silent. I think that was an infraction but in closing at page 155 Mrs. Nathan says Who are Nathan—she slipped—Nate and Squirrel? Well, you have heard their names. You have heard nothing about whether the police investigated or not. Perhaps they did, perhaps they did not. You don't know that because it was never asked and never answered. You don't even know who Nate and Squirrel are, their last name or if those were their real names.

While the State was saying that she knew perfectly well who it was. Now, she told you on Friday in this Court 'I didn't know who Nate and Squirrel were, I just put two and two together and that's what I wrote in voir dire.' Again on page 160 of the transcript, three, she said, the defendant and Nate and Squirrel, they continued on.

That's the three people in the car, Judge. The dead man's brother and the boy whose birthday it was and their companion. This again was emphasized in closing that those three people had seen the other three people, and it is absolutely critical and would have been critical to the defense that the misidentification of two of three certainly could lead a jury to believe there was a misidentification of three.

Peoples had abandoned his reliance on Rule 741 but claims that a specific request for the information was made. This is a major change of focus because there is a vast difference between evidence that might have affected the trial and that which creates a reasonable doubt where it would not otherwise exist.

If the State did suppress information of a favorable character to the defense, the information was not sufficiently material to have deprived Peoples of due process of law. The information was the possibility that Nathaniel Collins was seen by the victim's brother with Peoples some blocks from the scene of the crime after the shooting. According to McLarney when he asked Collins where he was on that evening, Collins named several locations. The testimony of Collins viewed in the best light for Peoples would have tended to impeach the credibility of one of the State's witnesses Anthony Blackstone and buttress Peoples' alibi.

The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense. *United States v. Agurs, supra.*

That buttress would have been provided by a witness who was "good buddies" with Peoples. Such testimony can in no way have said to "create a reasonable doubt that did not otherwise exist."

We, therefore, must decide whether the proffer of defense counsel of what occurred at the voir dire amounted to a request for specific evidence. In discussing the request as

made in *Brady,* the Supreme Court said in *Agurs, supra,* 427 U.S. at pages 104 and 106, 96 S.Ct. at pages 2397 and 2398:

The second situation, illustrated by the Brady case itself, is characterized by a pretrial request for specific evidence. In that case defense counsel had requested the extrajudicial statements made by Brady's accomplice, one Boblit.

    \*     \*     \*     \*     \*     \*

In *Brady* the request was specific. It gave the prosecutor notice of exactly what the defense desired. Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.

In many cases, however, exculpatory information in the possession of the prosecutor may be unknown to defense counsel. In such a situation he may make no request at all or possibly ask for 'all *Brady* material' or for 'anything exculpatory.' Such a request really gives the prosecutor no better notice than if no request is made. If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. The third situation in which the *Brady* rule

arguably applies, typified by this case, therefore embraces the case in which only a general request for '*Brady* material' has been made.

Even if we accept Peoples' version of the request at voir dire, this can not be deemed a specific request as envisioned by the Court in *Brady* and *Agurs.*

JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.