**Earl David INGE, Petitioner,**

v.

**Raymond K. PROCUNIER, Respondent.**

**Civ. A. No. 83–0069–L.**

United States District Court,
W.D. Virginia.

Feb. 22, 1984.

John E. Falcone, Lynchburg, Va., for petitioner.

Thomas D. Bagwell, Asst. Atty. Gen., Richmond, Va., for respondent.

## MEMORANDUM OPINION

TURK, Chief Judge.

Earl David Inge has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Inge seeks to overturn his conviction for first degree murder entered in the Circuit Court for the City of Lynchburg on November 3, 1975. By memorandum opinion and order entered July 15, 1983, this court determined that Inge has exhausted his available state remedies as to all of the allegations set forth in his petition. The court has conducted an evidentiary hearing as to the merits of one of petitioner's claims. Both sides have presented oral argument and written memoranda as to all three claims now before this court. The case is now ripe for disposition.

### I.

On April 26, 1975, one Clifford Smith was shot to death in his apartment in the City of Lynchburg. The death was due to a shotgun blast fired from the rear of the apartment. On June 2, 1975, the petitioner, Earl David Inge, was indicted for murder in the first degree. Inge's court-appointed attorneys sought and received a psychiatric examination so as to determine whether petitioner was competent to stand trial. The psychiatrist found no evidence of abnormal mental processes. Inge then entered a plea of not guilty and the case came to trial before a jury on September 9, 1975.

It seems that on April 8, 1975, almost three weeks prior to the murder, Clifford Smith discovered that his apartment was being burglarized. Smith chased the burglar outside the apartment and soon thereafter, Earl David Inge was apprehended in a wooded area behind the apartment complex. Smith identified Inge as the burglar. Petitioner purportedly threatened Smith at that time. Inge was charged with statutory burglary. At a preliminary hearing on that charge, Smith testified against the petitioner. These circumstances were brought to light during the murder trial.

Testimony was also received at the trial describing the wooded area behind the decedent's apartment. Apparently, a creek runs through that area. The wooded area meets the end of Fleetwood Drive about two hundred yards from the apartment. Immediately following the shotgun blast, someone was heard running through the woods. No one was seen running from the apartment through the parking area in front of the apartment complex, nor were any vehicles seen moving in that area.

A pickup truck with a camper shell was seen on Fleetwood Drive headed toward the creek at approximately 8:30–8:40 p.m. on April 26, 1975. Smith was killed sometime between 9:00 and 9:05 p.m. Another witness testified that a vehicle moved extremely fast out of Fleetwood Drive between 9:30 and 10:00 p.m. on April 26. The witness who saw the pickup truck on Fleetwood Drive identified petitioner's truck as very much like the one he had seen on April 26, 1975. Another witness testified that he had seen Inge behind the apartment complex on April 14, 1975, and that the petitioner was acting in a suspicious manner.

The Commonwealth also introduced evidence relative to two shotguns which were kept at the home of petitioner's parents. It seems that Inge was initially interviewed by police at that home in the early morning hours of April 27, 1975. A police officer testified that at that time, one shotgun was clean and the other was filled with sand around the breech. Later on the same day, both guns were seized pursuant to a search warrant. At that time, both guns were clean. Inge testified that he had used one shotgun to shoot blackbirds at his parents' home on the afternoon of April 26, and that the gun had become dirty at that time. He stated that he had cleaned it at the first opportunity. It is now undisputed that both shotguns remained either on or around the prosecution's counsel table throughout the trial. It is also undisputed that neither shotgun was ever tendered or received into evidence.

Petitioner's evidence at trial was that he was at work by 8:00 a.m. on April 14, 1975 and that he could not have been observed acting suspiciously at the apartment complex. Inge testified that he was fishing on the early evening of April 26, that he went to his parents' house to pick up his son, and that he left at about 9:00 p.m. to return to Lynchburg. The route taken by petitioner took him very near the apartment complex in which Smith resided.

After deliberating for approximately four and one-half hours, the jury found plaintiff guilty of murder in the first degree. Petitioner was later sentenced to life imprisonment by the presiding Circuit Court Judge.

## II.

As grounds for relief, petitioner now maintains that there was insufficient evidence to support his conviction; that the identification of his truck by the Commonwealth's witness deprived him of a fair trial; and that he received ineffective assistance of counsel due to counsel's failure to preserve reversible error with regard to the exhibition of the two shotguns. The first two grounds are of little moment and need not long detain the court.

■ In determining whether the evidence is sufficient to support a conviction, the court must view the evidence in a light most favorable to the Commonwealth and determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Even though the evidence against petitioner was purely circumstantial, the court must conclude that a rational trier of fact could have found Inge guilty of murder beyond a reasonable doubt. The Commonwealth's evidence established a motive. Inge's own testimony put him near the scene of the crime on the day in question. A witness identified petitioner's truck as having been the one at the scene of the crime at about the time of the shooting. The appearance of one of two shotguns at the Inge home shortly after the shooting indicated that it could very well have been transported through the muddy area behind Smith's apartment complex. The prosecution presented evidence suggesting that Inge's cleaning of this gun was suspicious.

It is not necessary for this court to agree that petitioner was guilty of the crime of murder beyond a reasonable doubt. It is only necessary to determine whether a rational trier of fact could have made that determination under the evidence presented. From the evidence presented in Inge's case, a rational trier of fact, choosing to believe the Commonwealth's witnesses, could find the essential elements of the crime beyond a reasonable doubt. The court concludes that the standard of *Jackson v. Virginia, supra* has been satisfied.

■ The court must also conclude that the testimony relative to the identification of petitioner's truck did not deprive him of a fair trial. The witness who identified the truck viewed it in the parking lot of petitioner's place of employment sometime after the shooting. The truck was, at that time, surrounded by policemen. Although no other trucks like petitioner's were in the

lot, the identification was not impermissibly suggestive. The identifying witness testified that there was no suggestion by the police that petitioner's truck was the one on Fleetwood Drive at the time in question. The witness merely testified that the truck appeared to be the one he had observed on Fleetwood Drive. The trial judge carefully considered the witness' testimony before such testimony was presented to the jury.

▆▆▆ Vehicles are not as distinctive and individual as are people. The court declines to extend all the requirements of a line-up identification of a defendant to the identification of an object. Viewed in this context, the court is unaware of any authority which would indicate that the admission of the testimony relative to the vehicle violated plaintiff's right to a fair trial. Because the admission of the identification did not violate the fundamental rights of petitioner, the admissibility, as a matter of state law, is not reviewable in a federal *habeas corpus* proceeding. *See Chance v. Garrison,* 537 F.2d 1212 (4th Cir.1976); *Grundler v. North Carolina,* 283 F.2d 798 (4th Cir.1960).

### III.

Petitioner's final contention concerns the effectiveness of his defense counsel in responding to the prosecution's treatment of the two shotguns seized from the residence of petitioner's parents. As previously noted, it is undisputed that both firearms remained on or around counsel table, in full view of the jury, throughout the trial. While two police officers and the petitioner made reference to the guns in their testimony, no effort was made by either side to have either shotgun admitted into evidence. Petitioner now urges that the presence of the shotguns was most prejudicial in impact, and that his attorneys clearly erred in failing to take steps to exclude those particular firearms from the jury's view and consideration.

▆▆▆ Under the Sixth and Fourteenth Amendments, a criminal defendant, subject to incarceration, must be afforded the right to assistance of legal counsel. The right to legal counsel implies a right to effective assistance of counsel. *Marzullo v. Maryland,* 561 F.2d 540 (4th Cir.1977), *cert. denied* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978). In *Marzullo,* the United States Court of Appeals for the Fourth Circuit took explicit departure from the "farce and mockery" test which had long governed the determination of adequacy of defense counsel in this Circuit. *See, e.g., Root v. Cunningham,* 344 F.2d 1 (4th Cir. 1965). The Fourth Circuit took the occasion in *Marzullo* to state the applicable rule in terms of the normal range of competency test which had been enunciated by the United States Supreme Court in *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Under this evaluation, this court is now required to compare the legal services rendered in the instant case to the range of competence normally demanded of attorneys in criminal cases. In *Marzullo,* the court also noted that effective representation is not the same as errorless representation. 561 F.2d at 444. Moreover, a trial strategy or tactic which appears in hindsight to have been wrong or ill advised does not necessarily constitute ineffective assistance of counsel. *Id.*

> A convict generally must establish that his counsel's error was so flagrant that a court can conclude that it resulted from neglect or ignorance rather than from informed, professional deliberation.

*Id.* (footnote omitted). On some occasions, the totality of the omissions and errors of defense counsel may reflect a lack of adequate representation in the preparation and trial of a criminal case. *See, e.g., United States v. Hammonds,* 425 F.2d 597, 604 (D.C.Cir.1970); *Lankford v. Foster,* 546 F.Supp. 241, 253 (W.D.Va.1982), *aff'd,* 716 F.2d 896 (4th Cir.1983). More frequently, the ineffective assistance is manifested primarily through one particular error or omission. *See, e.g., Taylor v. Starnes,* 650 F.2d 38 (4th Cir.1981) (ineffective assistance to deliberately refrain from requesting jury instruction in hope of obtaining reversible error); *Jennings v. Zahradnick,*

455 F.Supp. 495 (W.D.Va.1978) (ineffective assistance to concur in prosecution's recommendation for maximum sentence).

█ In the instant case, the court finds that defense counsel's representation was adequate and effective in most respects. However, the court must conclude that the specific failure of counsel to object to the use and display of the shotguns not admitted into evidence constituted a grave and fundamental error. While recognizing that not every trial error necessitates a finding of ineffective assistance of counsel, *Goodson v. United States*, 564 F.2d 1071 (4th Cir.1977), the court finds that the prejudicial effect of counsel's inadvertence in the instant case was so great as to necessitate relief.

The prosecution first made reference to the shotguns in its opening statement, at which time the Commonwealth's Attorney told the jury as follows:

At about 3:00 o'clock in the morning the police officers went to his parent's home up in Bedford County and there they found two shotguns, one of which was so full of sand and dirt that you couldn't even close the breach on it and the other one had recently been cleaned. It was his contention in relating to the police officers what transpired that he had fired one of those shotguns one time and that he had shot at some blackbirds. Now, quite frankly there will be some evidence in this case which is not helpful. It is negative evidence. The police officers in desperation did everything they could to try to develop the case. They took these shotguns and, incidently, the next day when they had a search warrant to go to the home to get the shotguns this one which was so filthy, had been cleaned up but still there was gravel and whatnot in the breach. The shotgun was sent to the lab. Dirt specimens from behind this apartment house was sent to the lab. There is a creek that flows down behind this apartment and the evidence will be it is a bold stream of

water. I think it's probably Black Water Creek. Water was taken from it and sent to the lab. Some old wet socks, which were found in his truck at Simplimatic where he was arrested were sent to the laboratory, but all of the evidence was negative. It's inconclusive as far as showing anything. It's no value. (Tr. 122–123).

At the evidentiary hearing conducted by this court, it was established that the two shotguns rested on or around the prosecution's counsel table throughout the subsequent trial of the case. It is undisputed that the firearms were in plain view of the jury at all times. On the second day of the trial, Officer K.L. Coleman testified that he had seen the two guns while visiting the home of petitioner's parents in the early morning on April 26, 1975. (Tr. 326). The officer stated that one of them was filled with sand around the breech. (Tr. 326). The same officer testified that he later viewed the guns after they had been brought to the police station. (Tr. 327). Officer Coleman related that some particles of sand were still in one shotgun, and that the shotgun with the sand was submitted for laboratory analysis.[1] (Tr. 335). However, no laboratory report was introduced at the time of the trial, and there was no indication as to its whereabouts.

The shotguns were later shown to a defense witness, petitioner's mother, who was unable to identify them. (Tr. 450). Another police officer, Henry Brockman, testified that he removed the shotguns from the residence. (Tr. 580, 582). During the Commonwealth's rebuttal, Officer Coleman was again called to testify concerning the shotguns. The officer related that at some point before the guns were seized, he suggested to Inge that the petitioner's father would be angry that one of the shotguns was so dirty. (Tr. 592). On recall, Coleman stated that no tests had been taken of the soil in the shotgun. (Tr. 591). He noted that he was unable to test the dirt he had initially seen on the firearm because he

---

1. Apparently, the police wanted to compare the sand from the shotgun with that found in the

wooded area behind Smith's apartment complex.

did not possess a warrant to seize the gun at that time. (Tr. 591–592).

In closing argument, the Commonwealth's Attorney commented as follows:

Now there is a strange thing with reference to this gun, which hasn't been introduced in evidence. I can't pick it up and show it to you but you saw the gun with the sleeve on the stock, the .12 gauge shotgun; and the police officers told you how filthy dirty it was when they went to that house at 3:10 A.M. on the 27th day of April, hours after this homicide. Now mind you, this defendant by his own admission goes back the next day and cleans that weapon. You say, what is so strange about that. He claimed he had previously fired that weapon before his parents came home, who said they came home around 1:00 o'clock in the middle of the day, at some blackbirds and he laid the gun down on the ground and then picked it up and carried it back and put it in the closet. Now he is at this position, according to his own admissions, that when Papa needed the grass cut, he cut the grass. He worked on Papa's power saw, he worked on the lawnmower and was doing things to help around the house and when all of this time was wiled away, why in the name of heaven didn't he clean that shotgun after he got all of that filth in it if it had happened that morning as he now contends. But I submit to you in the hurry skurry of trying to get away from his parents home, he put that shotgun in there in a hurry and he went away and went back the next day to clean it up after he knew the police were checking on the gun. He didn't know what was going to be revealed. (Tr. 664–665).

The obvious inference to be drawn from the prosecution's treatment of the shotguns was that the decedent had been killed with a shotgun and that Inge had access to several shotguns, one of which he had cleaned shortly after the shooting. The subtle, though more devastating inference was that one of the firearms on the prosecution table was the murder weapon; that it was generally being treated as such by the parties; and that it could not be so formally labeled because the necessity to obtain a search warrant had given Inge the opportunity to remove the incriminating sand. Stated differently, the continued and unchallenged presence of such weapons on the prosecution table, and the continuing references to same, could only have led a lay person to the suspicion that the weapons were in some way related to a horrible and bloody murder, despite the fact that there was no direct evidence to that effect. Since no cautionary instruction was either sought or given, the potential for such an improper inference was greatly increased.[2]

The trial transcripts reveal that the defense attorneys did not object to the prosecution's treatment of the shotguns at any time during the proceeding. Despite the fact that the guns had been handled and discussed by several witnesses, defense counsel did not seek any instruction to the effect that the shotguns were not to be considered as evidence. Defense counsel did not object to the continuing presence of the weapons in the courtroom, even though counsel apparently recognized the inflammatory nature of the crime, having had objected strenuously to the introduction of photographs of the deceased taken immediately after the shooting. (Tr. 154–156). Defense counsel made no attempt in closing arguments to indicate that the firearms had never been connected with the killing. Counsel failed to even mention the discrepancies as to whether laboratory tests had been done on the soil in the shotgun.[3] In

---

**2.** The shotgun which Inge had cleaned was admissible through either Officer Coleman or Officer Brockman. It also would not have been inappropriate for the court to have admitted a shotgun as a general example of the type of weapon involved in the shooting. In either instance, however, the probative value of the exhibit would have been explicitly limited by the terms of its admission.

**3.** To this day, it has still not been determined whether such a report was prepared as to the sand in the shotgun. A state *habeas* hearing on September 11, 1978 established that the shotgun and the sand had been sent off for study. In

short, defense counsel was oblivious to both the presence and the impact of the two weapons.

At the evidentiary hearing conducted by this court, one of petitioner's trial attorneys admitted that the duo had simply neglected to address the problem of the guns. The attorney opined that the guns might have been admissible, although he recognized that neither could have been admitted as the murder weapon. Stated simply, it is undisputed that the attorneys' response and omissions relative to the firearms did not occur as the result of any trial tactic or strategy. It is undisputed that this is not a case in which the attorneys made a conscious decision that, in light of hindsight, can now be seen to have been incorrect. The attorneys' response to the firearms can only be found to have been occasioned by professional neglect. By virtue of the continuing presence and frequent references to the firearms, the attorneys had numerous opportunities to raise an objection or request a cautionary instruction. On each occasion, they failed to do so. The court can only conclude that counsel's error resulted from "neglect or ignorance rather than from informed, professional deliberation." *Marzullo v. Maryland, supra* at 544. The court finds that the professional input from petitioner's defense counsel fell below the range of competence demanded of attorneys in similar cases.

As previously suggested, the professional omissions in petitioner's criminal case were such as to prejudice petitioner's right to be judged on evidence properly received in open court. In essence, the ineffectiveness of the defense counsel prevented Inge from receiving a fair trial. Several other courts have considered the potentially prejudicial impact of firearms produced at trial. While there would seem to be no other case directly on point, other courts have sug-

gested that relief would be justified in certain circumstances. In *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), the defendant had been in constructive possession of the sixteen gauge shotgun introduced at trial. The gun used in the crime, however, was a twelve gauge shotgun. This difference was pointed out to the jury. Thus, the Court was unable to conclude that the jury had been misled by the presence at trial of the sixteen gauge shotgun.

In *Baker v. Crisp*, 446 F.Supp. 870 (W.D. Okla.1978), the prosecutor borrowed a revolver from a deputy sheriff in the courtroom for use in his closing argument. There was no suggestion that the revolver was actually used by the defendant in the commission of the offense. In addition, defense counsel objected to the use of the revolver and the court immediately admonished the jury that closing arguments were not to be considered as evidence, adding that:

> "The State's attorney here is making an argument and using an illustration and does not claim that this was the weapon used in the alleged crime here, if a crime has been committed, which is for you to determine, but he is using that as a demonstration concerning the theories or points that he might have, and you of course, should give it consideration as you think it is worthy to receive, but certainly it is not evidence in the case."

446 F.Supp. at 873.

In *United States ex rel. Longstreet v. Warden, Illinois State Penitentiary*, 414 F.Supp. 674 (N.D.Ill.1975), three guns were admitted in evidence which were found in the suspect's possession when he was arrested. Two of the guns were unconnected with the robbery and were objected to. The court followed *Moore v. Illinois, supra* and looked to the entire record to

Findings of Fact and Conclusions of Law dated September 12, 1978, the state *habeas* judge deduced that no report was ever received by the police as to the sand in the shotgun. This court has no reason to believe otherwise. This circumstance also speaks poorly for the quality of the defense attorneys' representation. Accord-

ing to the testimony of one of the attorneys at the state *habeas* hearing, they had determined that the matter of the dirt in the shotgun was a major feature of the case. *See* Transcript of state *habeas* hearing at 22. Despite this fact, they apparently did not press the issue of a laboratory analysis prior to trial.

determine whether the petitioner was denied a fair trial. Noting that both petitioner himself and the third gun had been affirmatively identified by the victim, the court could not say that a fair trial was denied.

Comparing the instant case with those cited above, the court is unable to discern any of the mitigating circumstances upon which those latter cases turn. Unlike *Moore*, the shotguns shown at Inge's trial were of the same type as that used in the offense. Moreover, both guns could not have been used in the commission of the offense, but both guns were presented in connection with it. Finally, unlike *Moore*, there was no direct evidence connecting Inge with the crime. Thus, the resulting prejudice from improper exhibition was magnified in Inge's trial. Contrary to the facts in *Baker*, there were repeated suggestions that the shotguns exhibited in the instant case were used in the commission of the offense. Unlike the instant case, the defense counsel in *Baker* objected to the use of the guns and the court cautioned the jury regarding their consideration. More generally, the direct identification of either the defendant or the weapon which served to mitigate prejudice in the above cases stands in stark contrast to the circumstantial evidence which provided the only basis for conviction of the instant petitioner.

If the aforementioned cases illustrate any point, it is that the exhibition and introduction of firearms in a criminal proceeding must be undertaken with great care and diligence, both on behalf of the prosecution and, especially, defense counsel. In Inge's trial, defense counsel clearly failed to discharge this responsibility. Their failure prejudiced their client in such a manner as to impair his right to a fair trial. The court does not suggest that the mere failure to object to the display of evidence not admitted in the record would always constitute ineffective assistance of counsel. While such an omission might constitute an error in representation, such errors do not usually converge with the other circumstances of a case so as to amount to ineffective representation. Sometimes, however, they do, and the court must conclude that this is such a case. Counsel's omissions occurred in such a factual context as to amount to a gross abridgement of petitioner's right to effective counsel and, thus, a fair trial.

### IV.

For the reasons stated, the court must conclude that the representation afforded petitioner fell well below the range of competence demanded of attorneys in such cases. Accordingly, the court concludes that the writ of habeas corpus must issue. An appropriate judgment and order will be entered this day.

The clerk is directed to send certified copies of this opinion to all counsel of record.

### FINAL JUDGMENT AND ORDER

For the reasons stated in the court's opinion this day filed, the Writ of Habeas Corpus sought by petitioner in this proceeding is hereby granted, the judgment conviction order of November 3, 1975 is hereby vacated, and it is accordingly

### ADJUDGED AND ORDERED

that petitioner, Earl David Inge, be released from the custody of respondent as a result of said conviction in the Circuit Court for the City of Lynchburg, unless the Commonwealth of Virginia elects to rearraign and retry him within sixty (60) days from the date of this order. This order shall in no way affect any other sentence of imprisonment which petitioner may now be serving or to which he is subject to serve in the future. If the Commonwealth of Virginia elects to appeal this order to the United States Court of Appeals for the Fourth Circuit, no bond will be required and execution of this order will be stayed during the pendency of the appeal.

The clerk is directed to send certified copies of this judgment and order to all counsel of record.