OPINION
{¶ 1} The State of Ohio appeals the Portage County Court of Common Pleas' judgment granting Robert Gondor's ("Gondor") petition for post-conviction relief and vacating Gondor's convictions for involuntary manslaughter, kidnapping, and obstructing justice. We reverse.
 {¶ 2} On August 14, 1988, Connie Nardi ("Nardi") was beaten and strangled to death. Nardi's body was ultimately deposited in the Hiram Rapids Pond where it was discovered the following day. Troy Busta ("Busta"), Randy Resh ("Resh"), and Gondor were charged with the crime. In 1989, Busta pleaded guilty to Nardi's murder and subsequently testified against Gondor and Resh in their separate trials in 1990.
 {¶ 3} At trial, Busta testified to the following events: On Sunday, August 14, 1998, at about 5:30 p.m., Busta went to Ed's Upper Deck, a bar in Mantua, Ohio. While at the bar, he met and danced with Nardi. About thirty minutes later, Gondor and Resh arrived at the bar. At approximately 7:00 p.m., Busta took Nardi on a motorcycle ride to cool off. They drove to a washed-out bridge formerly crossing the Cuyahoga River on Allyn Road. After about forty-five minutes, they returned to the bar.
 {¶ 4} After returning to the Upper Deck, Busta and Resh talked. During this conversation Busta falsely bragged that he had had sex with Nardi. Resh asked Busta to persuade Nardi to return to the river and have sex with him. Busta agreed and the two planned for Busta to buy a six pack of beer and take Nardi back to the river. Gondor and Resh would follow fifteen or twenty minutes later.
 {¶ 5} The group stayed at the bar until approximately 8:30 p.m. Busta bought a "split six" of beer: three Coronas and three Pabsts. He then took Nardi back to the river on his motorcycle. As Busta and Nardi sat drinking beer, Resh and Gondor arrived in Gondor's white Ford pick-up truck. Resh asked Nardi if she would have sex with all three men. Nardi refused and Resh became angry. He grabbed Nardi and threw her to the ground, telling Busta and Gondor to hold her hands and feet. Resh sat on Nardi's stomach, while she struggled to free herself. During the struggle, Gondor stripped off Nardi's shorts and underwear. With a free leg, Nardi kicked Gondor; however, Resh subsequently struck Nardi several times on each side of her head. Ultimately, Resh choked Nardi to death while the other two held her down.
 {¶ 6} After choking Nardi, Resh stood up and announced "we've got problems." The group agreed to take Nardi's body to the pond on Rapids Road. They loaded the body in the back of Gondor's pick-up on top of a pile of two by fours. Gondor drove his truck and Busta drove his motorcycle to Rapids Road, where Gondor and Resh dumped the body into the pond. Busta dropped Nardi's purse into a ditch and disposed of the Corona bottles and Pabst cans on the opposite side of the bridge, in the weeds near the intersection of Abbot and Allyn Roads.
 {¶ 7} Busta returned to the Upper Deck. Resh and Gondor had also returned and were drinking more beer. They stayed until closing time — midnight. When they went out to Gondor's truck they apparently noticed some wood in the back was stained with blood. They began tossing the wood across the street into the parking lot of another bar; however, a bartender came out and ordered the three men to stop. The group then went to Busta's father's house to drink more beer. However, Busta's father became irritated with Busta so Gondor and Resh left, returned to Resh's trailer and ordered a pizza from Domino's Pizza in Streetsboro.
 {¶ 8} Gondor's version of the events of August 14, 1988 was significantly different from Busta's. In particular, Gondor testified that upon arriving at the Upper Deck, he sat with Resh, who told him about a woman who had been dancing on the bar and had left with Busta. Sometime later, Busta and the woman returned. Then, between 9:20 p.m. and 10:00 p.m., Gondor and Resh left the Upper Deck and went to the Village Tavern. They stayed there thirty to forty-five minutes then returned to the Upper Deck. Gondor noticed Busta returned to the Upper Deck at approximately 11:15 p.m. When the Upper Deck closed at midnight, he followed Resh back to Resh's trailer. Gondor admitted without explanation that he, Resh, and Busta threw some pieces of wood from the bed of his truck while in the Upper Deck parking lot.
 {¶ 9} The state relied upon three principle categories of evidence at Gondor's original trial: Busta's testimony, "false alibi" evidence, and "invisible" blood evidence. Specifically, Busta testified he, Resh, and Gondor killed Nardi on the night of August 14-15, 1988 and disposed of her body. The state also presented evidence that Resh and Gondor attempted to create an alibi for their whereabouts the night of Nardi's murder before they were suspects. The state argued this demonstrated "guilty knowledge," i.e., only knowledge the perpetrators would possess. Finally, the state presented "invisible" blood evidence that Bureau of Criminal Investigation (B.C.I.) Criminalist Dale Laux ("Laux") testified was found in the bed liner of Gondor's pick-up truck.
 {¶ 10} Gondor was convicted of involuntary manslaughter, kidnapping, and obstructing justice.[1] His convictions were based largely on Busta's eyewitness testimony. On October 17, 1990, Gondor was sentenced to ten to twenty-five years for both involuntary manslaughter and kidnapping, and eighteen months for obstructing justice, all sentences to run consecutively.
 {¶ 11} Gondor appealed his convictions to this court. We affirmed. SeeState v. Gondor (Dec. 11, 1992), 11th Dist. No. 90-P-2260,1992 Ohio App. LEXIS 6219.
 {¶ 12} On September 20, 1996, Gondor filed a petition for post-conviction relief without attaching any evidentiary materials. The trial court denied the petition without making and filing findings of fact and conclusions of law. Gondor moved the court to reconsider and filed an amended petition with attached evidentiary materials. The trial court denied the amended petition and Gondor appealed. After remanding the case for the trial court's findings of facts and conclusions of law, we considered the appeal. See, State v. Gondor (Dec. 19, 1997), 11th Dist. Nos. 96-P-0261 and 97-P-0017, 1997 Ohio App. LEXIS 5751. Subsequently, we remanded the case holding the trial court erred in denying the petition without first conducting an evidentiary hearing.
 {¶ 13} The matter proceeded to a post-conviction hearing. In support of their petitions, Gondor and Resh claimed the state failed to turn over relevant and exculpatory evidence as required by Brady v. Maryland
(1963), 373 U.S. 83 and that they were denied the effective assistance of counsel.
 {¶ 14} Busta sought to intervene in the post-conviction proceedings for the limited purpose of disqualifying Resh's counsel and preventing the disclosure of privileged attorney-client material.[2] See, Statev. Gondor (June 29, 2001), 11th Dist. No. 99-P-0034,2001 Ohio App. LEXIS 2958. The trial court denied Busta's motion, but stayed the post-conviction hearing pending Busta's appeal of the trial court's ruling. We reversed the trial court's decision denying Busta's motion to intervene and remanded the matter to the trial court.
 {¶ 15} During the post-conviction hearing, Gondor's trial counsel, Gary Levine, ("Levine") testified he began representing Gondor prior to Gondor's April 4, 1990 indictment. Levine was in a solo practice and did not use an investigator for this case. He testified he had adequate time to prepare for trial. However, he indicated he remembered interviewing only two of the state's twenty-three witnesses.
 {¶ 16} Levine testified the prosecutor alerted him to the open-file discovery procedure. Nevertheless, Levine filed numerous discovery requests and testified he expected formal responses to his discovery demands pursuant to Crim. R. 16. In a letter from Prosecutor Norris ("Norris") to Levine dated April 13, 1990, Norris informed Levine that the prosecution would furnish discovery by May 1, 1990. The letter also stated that Portage County used an open-file discovery procedure.
 {¶ 17} In addition to formal discovery, Levine testified he personally viewed the prosecution's file on a number of occasions. He testified he was not denied access to the file and he participated in open-file discovery in addition to the more formal rule discovery; Levine testified he did not make any copies of the prosecution's file.
 {¶ 18} Ron Craig ("Craig"), an investigator for the Portage County Prosecutor's Office, testified that in 1990, he was responsible for gathering all of the evidence pertaining to the Nardi homicide. He organized the evidence by putting it into a master file made freely available to Levine.
 {¶ 19} Craig testified Levine looked at the file several times. Craig recalled Levine making multiple trips to the prosecutor's office to review discovery, viz., Craig stated Levine was at the prosecutor's office at least once a month. Craig testified he made copies of whatever Levine wanted from the master file.
 {¶ 20} After the eight day joint post-conviction hearing, the trial court denied Gondor's Brady claim, finding the prosecution did not withhold material, exculpatory evidence. However, the trial court found Gondor received ineffective assistance of counsel because Levine failed to properly investigate the prosecutor's file and present evidence contained therein. Thus, the trial court vacated Gondor's convictions and ordered a new trial.
 {¶ 21} On July 1, 2002, the state filed a timely notice of appeal raising the following assignments of error:
 {¶ 22} "[1.] The trial court's findings of fact and conclusions of law are clearly erroneous and therefore inadequate to meet the mandate of R.C. 2953.21 or to permit this Court to review the trial court's decision.
 {¶ 23} "[2.] The trial court's decision overruling the Appellant's Civ. R. 41 motion to dismiss was in error as the Petitioner failed to establish a denial of the effective assistance of trial counsel in violation of the Petitioner's Sixth Amendment [sic] to the United States Constitution and Article I, Section 16 of the Ohio Constitution.
 {¶ 24} "[3.] The trial court's decision granting the Petitioner postconviction relief on his ineffective assistance of counsel claim was contrary to the manifest weight of the evidence."
 {¶ 25} It is important to note the standard of review we apply in determining this appeal, i.e., we review the trial court's judgment granting Gondor's petition for postconviction relief de novo. State v.Braden, 10th Dist. No. 02AP-954, 2003-Ohio-2949, ¶ 13.
 {¶ 26} In its first assignment of error, the state challenges the validity of the trial court's findings of fact and conclusions of law on six grounds: (1) the trial court's finding of the date of the Nardi homicide is clearly erroneous; (2) the trial court's findings of fact regarding the trial testimony of Gondor and Busta is clearly erroneous; (3) the trial court's inherently inconsistent findings and conclusions regarding Gondor's separate claims for relief are clearly erroneous; (4) the trial court's finding that a climatological report was exculpatory and its finding that the report demonstrated Brenda Holcomb's ("Holcomb") trial testimony was wrong is clearly erroneous; (5) the trial court's summary of the 1990 Serological Institute report is clearly erroneous; and (6) the trial court's finding that specific evidence presented at the hearing and referred to in the trial court's entry was in existence at the time of Gondor's trial is clearly erroneous.
 {¶ 27} "The existence of findings and conclusions are essential in order to prosecute an appeal. Without them, a [party] knows no more than he lost and hence is effectively precluded from making a reasoned appeal. In addition, the failure of a trial judge to make the requisite findings prevents any meaningful judicial review, for it is the findings and the conclusions which an appellate court reviews for error." Statev. Mapson (1982), 1 Ohio St.3d 217, 219.
 {¶ 28} The test for adequacy for findings and conclusions is "* * * whether they are sufficiently comprehensive and pertinent to the issue to form a basis for the decision and whether they are supported by the evidence." State v. Clemmons (1989), 58 Ohio App.3d 45, 46, quoting S A Moore, Federal Practice (2 Ed. 1990) 52-142, section 52.06(1). "In order for an appellate court to determine the basis for judgment, the findings and conclusions should respond to all material or determinative issues in the case." State v. Lindsey, 12th Dist. No. 2002-02-002, 2003-Ohio-811, at 8.
 {¶ 29} The state first argues that a typographical error set forth at the beginning of the trial court's June 14, 2002 findings renders the findings and conclusions clearly erroneous. Specifically, the trial court listed the date of the homicide as August 14, 1998 rather than August 14, 1988. The date is quoted correctly throughout the remainder of the court's findings and conclusions. The state fails to explain how this typographical error affected the trial court's analysis and we find this error harmless.
 {¶ 30} The state next claims the trial court's findings and conclusions erroneously summarized certain testimony from the original trials of Gondor and Resh. Specifically, the state maintains the trial court's findings of fact include a "large discrepancy" regarding when Busta left the bar to purchase the "split-six" of beer. The court's June 14, 2002 entry indicates Busta left the bar at "about 8:30." We fail to see the purported discrepancy. Specifically, we noted in State v. Gondor
(Dec. 19, 1997), 11th Dist. Nos. 96-P-0261 and 97-P-0017,1997 Ohio App. LEXIS 5751, at 3, that Busta stayed "* * * in the bar until about 8:30 p.m." Busta testified at Resh's trial that he left at 8:30 p.m. and we noted the same in State v. Resh (1997), 124 Ohio App.3d 694. Hence, the statement regarding Busta's departure is supported by the record and, even if it were not, the alleged misstatement does not undermine the court's ultimate conclusions.
 {¶ 31} The state also contends the trial court failed to mention that Busta returned to the bar alone. The court's findings and conclusions state: "Busta then returned to the Upper Deck bar. Resh and Gondor had also returned and were drinking more beer." The court's findings imply Busta did, in fact, return to the Upper Deck alone.
 {¶ 32} The state further notes that the record of both trials reflects that Busta testified that Gondor removed Nardi's shorts while Resh sat on her stomach. In its entry, however, the court states that "Resh * * * sat on Connie Nardi's stomach and stripped off her shorts and underwear." As Gondor points out, were "Gondor" inserted between "and" and "stripped," the statement would be thoroughly accurate. Despite this minor mischaracterization of the facts, the court's finding does not impair the comprehensiveness of the findings such that they fail to form a basis for the decision. Thus, this omission is harmless.
 {¶ 33} The state next contends the court's findings and conclusions fail to note a "major contradiction" in Gondor and Resh's testimony regarding whether they followed Busta home on the night in question. Gondor testified at his trial that they did not. Resh was unsure. Such testimony is not necessarily contradictory. Even were we to find such a contradiction, the contradiction is not material to the issue of whether Gondor received ineffective assistance of counsel. Therefore, we hold that the trial court's summary of the trial testimony was sufficiently comprehensive and pertinent to the issue to form a basis for the decision and was supported by the evidence. Clemmons, supra, at 46.
 {¶ 34} Next, the state argues the trial court's decision regarding Gondor's two claims for relief, viz., the Brady violation and ineffective assistance of counsel claim, are inherently inconsistent. Specifically, the state alleges, that in denying Gondor's Brady claim, the trial court necessarily disregarded Levine's testimony. As such, the trial court's reliance on Levine's testimony in concluding Gondor received ineffective assistance is inherently inconsistent. We disagree.
 {¶ 35} Under Brady, the petitioner must present evidence to prove the state failed to disclose material, exculpatory evidence. See, e.g., Moorev. Illinois (1972), 408 U.S. 786, 795. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. United States v. Bagley (1985), 473 U.S. 667,682. The standard of materiality for a Brady violation is the same as that of prejudice for an ineffective assistance claim.
 {¶ 36} Here, the trial court found no Brady violation because the prosecutor's files contained the evidence on which Gondor relied in support of his post-conviction petition and Portage County utilized an open-file discovery procedure. Alternatively, the trial court found:
 {¶ 37} "As to the second ground alleged, i.e.[,] that the Petitioners were denied effective assistance of counsel, the Court finds that the evidence itemized herein dehors the record, that such evidence is material as defined in * * * Bagley * * *; that for failing to use such evidence in the trial, counsel for each of the Petitioners was ineffective, that had such evidence been disclosed to the juries that decided these cases, there is a reasonable probability that the result of the proceedings would have been different. Certainly the juries should have been given this evidence for their consideration for their verdicts to be worthy of confidence. Without the benefit of such evidence this Court finds the verdicts rendered are not worthy of confidence."
 {¶ 38} When asserting an ineffective assistance claim, a party must show deficient performance and subsequent prejudice. Strickland v.Washington (1984), 466 U.S. 668. Here, the trial court found Levine's performance was deficient because he failed to use the evidence available to him at the 1990 trials. The trial court also found there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, i.e., the verdict was not worthy of confidence.
 {¶ 39} As such, the trial court's denial of the Brady claim and affirmation of the Strickland claim were mutually distinct in both analysis and conclusion. Gondor failed to meet the first prong of theBrady claim (failure to disclose) and, consequently, it was unnecessary for the court to reach the materiality prong. However, the trial court concluded that both prongs of the Strickland test were met. Therefore, the findings of the trial court were consistent with the relevant and controlling case law.
 {¶ 40} Next, the state maintains the trial court's findings regarding Holcomb's[3] testimony and its impact on the "false alibi" theory were clearly erroneous. The trial court's findings and conclusions state:
 {¶ 41} "At the hearing, Brenda Holcomb testified that it was raining when Gondor and Resh came into the shop. At the time, the entire area was in the midst of a severe drought and the only days it rained were on Thursday and Friday, August 18 and 19, 1988. This was evidenced by a Climatological Report covering the days in question."
 {¶ 42} The state argues the court's statement that the "only days it rained were on * * * August 18 and 19," is erroneous because the climatological report indicated rain in the area on August 5, 15, 18, 19, 25, and 28. The state is correct that the court misstated the evidence when observed in its entirety. However, to the extent the court was relying on "the days in question," the court's conclusion is accurate. That is, Holcomb indicated at trial that Resh and Gondor were in the pizza shop on August 16. However, there was no evidence of rain on August 16. The precipitation record does indicate it rained on both August 18 and 19, after Easthon interviewed Gondor. However, the climatological report was taken from the Akron-Canton Airport and used as evidence of the weather conditions for the Portage County area. The report offers no evidence of rainfall for the specific area in question. It is impossible to assume the weather at the Akron-Canton Airport was the same or even similar to that in Portage County, therefore, the climatological report had little value. The trial court's reliance on the climatological report was clearly erroneous.
 {¶ 43} Finally, the state attacks the trial court's description of the July 6, 1990 Serological Research Institute report authored by Chief Forensic Serologist Brian Wraxall ("Wraxall"). Specifically, the trial court found that:
 {¶ 44} "* * * Dale Laux of the Bureau of Criminal Investigation * * * testified that stains found in the bedliner [sic] of Gondor's pickup truck were human blood. This testimony was very important because it corroborated the testimony of Troy Busta about putting Connie Nardi's body in the bed of Gondor's truck. At the time of trial, the Prosecution also had a report from the Serological Research Institute ("SERI"), Richmond, California dated July 6, 1990, which, after describing the tests performed, ruled out blood stains and stated that the stains were `most likely perspiration.' This report was not used at either trial, although the testimony established that both defense counsel, by phone call from Ron Craig, Prosecutor's Investigator, and in person by David Norris, Prosecutor, were notified of its existence."
 {¶ 45} The state correctly notes the SERI report was inconclusive as to the nature and origin of the bloodstain. Wraxall's report explained that the sample contained no Gamma (Gm) or Kappa (Km) markers, stable genetic markers found in blood serum as well as other bodily fluids. Further, Wraxall's report notes DNA is found in white blood cells, sperm cells, saliva, vaginal cells, and tissue epithelial cells; however, no DNA was found in the sample taken from the truck. Despite this, Wraxall consistently referred to the sample taken from Gondor's truck as a "bloodstain."
 {¶ 46} The trial court failed to expressly acknowledge these competing characterizations in the 1990 SERI report. Instead, the trial court mischaracterized the 1990 SERI report when it explicitly found it "ruledout blood stains" and stated that the stains were "most likelyperspiration." (Emphasis added). The 1990 SERI report neither overtly nor implicitly makes such categorical assertions. The trial court's entry should have reflected that the 1990 report was inconclusive. The failure to do so was error in that the trial court overstated the potential value of the evidence.
 {¶ 47} We note that a 1991 letter addressed to Gondor and a 1996 affidavit, both from Wraxall, and Wraxall's April 30, 2001 deposition, were admitted at the postconviction hearing. In the affidavit, Wraxall stated he now believed his testing revealed that the substance might have been derived from some fluid or tissue other than blood. This conclusion was echoed in Wraxall's 2001 deposition. Wraxall's affidavit stated:
 {¶ 48} "The best interpretation of these results is that the presumptive tests are false positives, and the human protein originated from some human body fluid that does not contain DNA or serum proteins. The body fluid that best fits this scenario is perspiration."
 {¶ 49} It is clear the trial court's finding falsely attributed language found only in Wraxall's 1996 affidavit and 2001 deposition to the 1990 SERI report. The 1996 affidavit containing the conclusion on which the trial court relied did not exist at the time of Gondor's trial. This belies the trial court's statement that "[i]t must be noted that the evidence presented at the hearing and referred to hereinafter was in existence at the time of both trials." In our view, the trial court's conclusions of law regarding the blood evidence presented at trial were clearly erroneous as they were premised on evidence that did not exist at the time of trial.
 {¶ 50} We hold that the lower court's findings of fact and conclusions of law were sufficiently comprehensive and pertinent to the issues raised with respect to: (1) the date of the Nardi homicide; (2) the alleged inconsistencies within the trial testimony of Resh and Gondor; and (3) the consistency of the trial court's resolution of the Brady and ineffective assistance issues. However, we hold the trial court's findings of fact and conclusions of law were inadequate and clearly erroneous regarding: (1) the climatological report; (2) the summary of the 1990 SERI report; and (3) the finding that specific evidence present at the time of the hearing and referred to in the judgment entry existed at the time of Gondor's trial. For these latter reasons, the state's first assignment of error has merit.
 {¶ 51} We review the state's second and third assignments of error together as both include an analysis of the manifest weight of the evidence. Under its second assignment, the state argues the trial court erred by overruling its Civ. R. 41(B)(2) motion to dismiss Gondor's ineffective assistance claim; under its third assignment, the state argues the trial court's decision granting Gondor relief on his ineffective assistance claim was against the manifest weight of the evidence.
 {¶ 52} Pursuant to Civ. R. 41(B)(2), a defendant may, after the plaintiff has presented his evidence and rested, move for a dismissal of the action on the ground that, upon the facts and law, the plaintiff has failed to show a right to relief. L.W. Shoemaker, M.D., Inc. v. Connor
(1992), 81 Ohio App.3d 748, 752. In ruling on a Civ. R. 41(B)(2) motion, the trial court determines whether the plaintiff proved the necessary facts by the necessary quantum of proof. Lance-Sepesi v.Goris, 6th Dist. No. WD-02-028, 2003-Ohio-1622, at ¶ 9. The conclusions of the trial judge may not be set aside unless they are erroneous as a matter of law or against the manifest weight of the evidence. Connor,
supra, at 752. Judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed as against the manifest weight of the evidence. Sharaf v. Youngman,
10th Dist. No. 02AP-1415, 2003-Ohio-4825, ¶ 8, citing C.E. Morris Co. v.Foley Constr Co. (1978), 54 Ohio St.2d 279, syllabus.
 {¶ 53} The state alleges Gondor's claims were not supported by competent, credible evidence going to all essential elements of his ineffective assistance claim. Therefore, the state argues the trial court's decision to overrule its Civ. R. 41(B)(2) motion was against the manifest weight of the evidence.
 {¶ 54} The Sixth Amendment to the United States Constitution
guarantees the right to effective assistance of counsel. The purpose of this guarantee is to ensure criminal defendants receive a fair trial and ensure a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Strickland, supra, at 691-692.
 {¶ 55} When we review an ineffective assistance claim, the benchmark is "[w]hether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. To prevail on a claim of ineffective assistance, Gondor must show his counsel's performance was deficient. "This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed by the Sixth Amendment." Id. at 687. Gondor must also show prejudice resulting from the deficient performance. Id. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. Gondor must show "* * * that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. We presume counsel's conduct was within the wide range of reasonable professional assistance. Id. See, also, State v. Bradley (1989),42 Ohio St.3d 136, 143.
 {¶ 56} We need not address the two prongs of Gondor's ineffective assistance claim in the order set forth in Strickland.
 {¶ 57} "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, supra at 697.
 {¶ 58} The state contends Levine's failure to present the evidence in question was a reasonable trial strategy and Gondor failed to overcome the strong presumption favoring this conclusion. The state argues that although Gondor's ultimate defense was total innocence, Levine's failure to pursue the evidence in question was a result of a reasonable trial strategy. The state concludes Gondor was not denied effective assistance of counsel because Levine chose not to pursue every possible trial tactic. State v. Brown (1988), 38 Ohio St.3d 305, 319. Thus, the state concludes the trial court erred when it denied its Civ. R. 41(B)(2) motion because Gondor failed to overcome Strickland's presumption that Levine's failure to utilize the evidence was nothing more than a reasonable trial strategy.
 {¶ 59} Gondor contends Levine's failure to present the evidence, in light of Gondor's defense of innocence, was a result of Levine's failure to conduct a reasonably complete investigation. As such, no reasonable trial strategy could support his decision. The failure to present the evidence, consequently, prejudiced Gondor such that the outcome of his trial was fundamentally unworthy of trust. We disagree with Gondor's contentions, but not necessarily for the reasons enunciated by the state.
 {¶ 60} The trial court relied on the following evidence in determining Gondor had received ineffective assistance of counsel:
 {¶ 61} False Alibi Evidence
 {¶ 62} During the 1990 trial, the state presented evidence Resh and Gondor contrived alibis to the Nardi homicide before they knew they were suspects, to wit: Nardi was killed Sunday, August 14, 1988; Resh and Gondor ordered a pizza from Domino's following the crime; the owner of Domino's testified Gondor contacted Domino's on Monday, August 16, 1988 to obtain a receipt from the previous night's order.[4]
 {¶ 63} The state presented evidence that both Resh and Gondor went into Domino's on Tuesday, August 16, 1988 to verify the Sunday order. The state argued Resh and Gondor's order verification was an attempt to establish an alibi before they had been labeled official suspects.[5]
The state concluded their actions were evidence of their "guilty knowledge" of a crime to which they had not yet been officially connected.
 {¶ 64} At the post-conviction hearing, Gondor presented evidence challenging the state's "false alibi" theory. Specifically, Gondor presented evidence that Rick Hollibaugh ("Hollinbaugh") and Holcomb were working at Domino's when Resh and Gondor picked up their pizza on the night of the murder. Craig interviewed Hollibaugh on March 6, 1990 and established Hollibaugh was working with Holcomb the evening Resh and Gondor returned to confirm their order. Domino's work records from Sunday, August 14, 1988 through Sunday August 21, 1988 show the only date after August 14, 1988 Holcomb and Hollibaugh worked together was Friday, August 19, 1988 — after authorities had contacted both Resh and Gondor regarding the Nardi homicide.
 {¶ 65} Moreover, Holcomb's grand jury testimony and her testimony at the postconviction hearing indicate it was raining when Resh and Gondor returned to confirm their order. Gondor presented a climatological report from the Akron-Canton Airport for August 1988. This report showed it rained on August 5, 15, 18, 19, 25, and 28. Gondor claimed this report, in conjunction with Hollibaugh's testimony and the work records indicated the only time he and Gondor could have returned to Domino's was Friday, August 19, 1988 — after they were interviewed by authorities.
 {¶ 66} Levine testified his trial strategy centered on Gondor's total innocence. He testified all of the exculpatory evidence would have conclusively destroyed the state's false alibi theory. He also testified that if this evidence had been available to him and he did not use it, his representation would have been ineffective.
 {¶ 67} Levine also testified he was told before trial by Domino's that no work records existed and therefore, he did not subpoena them. Levine stated he did not receive the records through formal discovery and did not remember seeing either the records or Hollibaugh's interview before or during trial. Levine testified he neither received nor saw Holcomb's grand jury testimony, which indicated it was raining the day Gondor and Resh returned to verify their order. Further, Levine did not interview Domino's employees before trial. However, Levine stated that if he had the grand jury testimony he would have checked to see what day(s) it rained during that week in August, 1988.
 {¶ 68} When Easthon interviewed Resh on August 17, 1988, and Gondor on August 18, 1988, he did so to obtain information from ostensible eye witnesses; at that point, Gondor and Resh were not suspects. At the post-conviction hearing, a complete transcript of Easthon's August 17, 1988 interview with Resh was presented. During the interview, Easthon explained he was speaking with Resh only to gather information regarding what he saw on the night in question. Easthon neither adopted an accusatory tone nor gave Resh any reason to believe he was a suspect. Nothing in the interview suggests Resh was a suspect. However, during the interview, without being asked, Resh produced his Domino's receipt to "prove" his whereabouts at 12:42 a.m. on the night of the murder. This spontaneous gesture supported the state's theory that Resh had guilty knowledge of the homicide when he and Gondor returned to Domino's to verify their order.
 {¶ 69} Further, the record suggests that, although Resh became a suspect "in Easthon's mind" after Easthon interviewed Gondor on August 18, 1988, Gondor and Resh were not official suspects before August 19, 1988 when they allegedly returned to Domino's. Whether Gondor and Resh went to Domino's on Tuesday, August 16, 1988, or Friday, August 19, 1988, is irrelevant. When they confirmed their order they told Holcomb they were being investigated for a murder, yet neither Resh nor Gondor had been told he was being investigated for murder.
 {¶ 70} The jury also heard evidence to support both the state's and defense's versions of the timeline regarding Gondor's phone call and the second visit to Domino's. On cross-examination, Easthon admitted that a six minute phone call was placed from Gondor's residence to Domino's on August 18, 1988. The record reflects that the only evidence of a phone call from Gondor's residence to Domino's the week of August 14-20, 1988, was this call. Levine vigorously cross-examined Easthon on the state's timeline in light of the phone bill. The jury heard both arguments regarding the sequence of events; notwithstanding the defense's evidence, the jury still convicted.
 {¶ 71} The record of Gondor's 1990 trial reveals Levine presented substantial alibi evidence in an attempt to account for Gondor's whereabouts on the evening of the murder. This evidence was presented through the testimony of Douglas and Maryann Walter, a bartender at the Village Bar. The jury obviously rejected this evidence. Thus, even if Levine should have presented the omitted evidence to counter the state's false alibi theory, Gondor suffered no prejudice. In other words, Levine presented alibi evidence to account for Gondor's whereabouts at the time the state alleged Nardi was murdered. Any evidence Levine could have presented to counter the state's false alibi theory based on Gondor and Resh's confirmation of their Domino's order would have had little or no value.
 {¶ 72} The omitted evidence does not undermine the state's claim and Gondor has failed to demonstrate he suffered prejudice from Levine's omission of this evidence.
 {¶ 73} The "false alibi" evidence presented at the post-conviction hearing does not undermine the state's claim and its presentation would have had little value. The state's "false alibi" theory was carefully attacked during Levine's cross-examination of Easthon. To wit, Levine underscored the improbability of Gondor and Resh attempting to establish an "alibi" at the time in question.
 {¶ 74} Blood Evidence
 {¶ 75} During the 1990 trials of Resh and Gondor, the state presented evidence to establish that human blood was found on the bed liner of Gondor's truck. Busta testified that after Nardi was murdered, they placed her body in the back of Gondor's truck, in the general area where the bloodstains were found. The invisible bloodstain evidence was provided through the testimony of Laux, a criminalist with B.C.I.
 {¶ 76} In addition, the state had the alleged bloodstains tested by SERI. As we discussed above, the SERI report was inconclusive for the presence of blood and did not reveal the presence of DNA. In spite of this, Wraxall referred to the sample as blood throughout the report[6]
even though the report stated, "No conclusion can be drawn regarding the Gm, Km, or DQ type of the blood from the truck." Neither the report nor Wraxall's testimony was presented to the jury.
 {¶ 77} Gondor presented Wraxall's 2001 videotaped testimony at the postconviction hearing. In his testimony, Wraxall indicated his test, when considered in relation to Laux's tests, established only that the substance in the truck's bed liner contained human protein. Wraxall indicated the best scientific conclusion that could be drawn from the tests was that the substance was human perspiration, not blood. Wraxall stated that had he been contacted by the defense and informed about Laux's tests, he would have testified the same way at the 1990 trials.
 {¶ 78} Levine testified he did not receive or see Wraxall's report before or during Gondor's trial. Levine stated that during his cross-examination of Laux, Laux indicated that a test separate from his own had been performed on the alleged bloodstain evidence. Levine testified he was highly surprised by this testimony because he was unaware of any tests other than those Laux conducted. Levine opined that the report was significant, however, because the absence of the blood markers and DNA seemed to indicate the substance discovered in Gondor's truck was not blood. Levine stated had he received the SERI report, he would have contacted Wraxall, as his professional obligations would require.
 {¶ 79} Levine was made aware of the 1990 SERI report at trial during his cross-examination of Laux. After approaching the bench and a discussion with the court and prosecutor, he continued his cross without further inquiry into Wraxall's analysis. Such a maneuver suggests Levine assessed its impact and determined the report was of negligible value. Such decision-making can be understood as a legitimate trial tactic.
 {¶ 80} Even assuming Levine should have presented the 1990 SERI report to the jury his failure to do so did not prejudice Gondor. Laux admitted on cross-examination that the sample could not be typed, dated, or directly associated with any particular person. Without evidence specifically connecting the blood to Nardi, the evidence failed to support the state's case against Gondor. The questions Levine asked during his cross-examination of Laux effectively assailed the probative value of the blood evidence.[7]
 {¶ 81} Both the trial court and the dissent in this case characterize the SERI report and Wraxall's testimony as "exculpatory." The use of this term when referring to the evidential value of this evidence is improper. Black's law dictionary defines "exculpatory evidence" as "* * * evidence which tends to justify, excuse or clear the defendant from alleged fault or guilt." Black's Law Dictionary (6th Ed.), 566. The evidence at issue, while of some value, does not rise to the level of exculpatory evidence. It simply would have given the jury an alternative theory, i.e., a theory that the stain was not blood. Defense counsel adequately presented this theory to the jury through the cross-examination of Laux.
 {¶ 82} Although Levine did not use the 1990 SERI report, its findings were inconclusive and consistently referred to the sample as a "bloodstain." Further, although Levine failed to contact Wraxall regarding his July 6, 1990 report, he thoroughly cross-examined Laux on the inability of the tests to identify whose blood was found or when it was left in the bed liner. Levine was not ineffective for failing to use the 1990 SERI report as his cross-examination acted to summarize the substantive conclusions of the report. Levine's cross-examination of Laux undermined the persuasive value of the blood evidence; therefore, Gondor did not suffer prejudice from Levine's failure to use the SERI report.
 {¶ 83} Evidence Gondor did not participate in the Nardi homicide.
 {¶ 84} Gondor also offered evidence at the post-conviction hearing of six witness statements, which were not presented to the jury during his 1990 trial.
 {¶ 85} First, Donna Sabarese ("Sabarese") provided police with a statement regarding an encounter she had with three men several hours after Nardi was murdered. Sabarese stated that in the early morning hours of Monday, August 15, 1988, she was delivering newspapers in the general vicinity where Nardi's body was found. Sabarese indicated she was approached by three men who declared they were looking for a missing girl. Sabarese warned the men to stay away from her and, although she described them as agitated and upset, they left. Sabarese recalled that the men were carrying pipes because, as they left, she heard what she described as a "tinny" sound as something hit the ground. During a search of the area where the encounter took place, police found a metal strut and a blue broom handle.
 {¶ 86} Also in the prosecutor's file was a telephone interview conducted by Easthon with Ed Douglas, ("Douglas") the owner of the Upper Deck bar. In the interview, Douglas told Easthon he had information that Busta and Nardi went to a party the night of August 14, 1988 where two other men, Eddie Price and Bennett Nelson, were present. In response, Easthon stated: "[w]ell, we haven't spoken to these two guys. Yeah, we're beyond that. We're in the more critical stages now." The trial court held this report could have been used to impeach Easthon's testimony by showing he failed to follow up on a potential lead and to lend credibility to evidence indicating Busta committed the offense with two men other than Gondor and Resh.
 {¶ 87} Gondor also presented a police report containing a statement of Pauline and Fred Green ("the Greens"). The Greens lived at the corner of Allyn and Abbot Roads; on the opposite side of the river from where Busta testified the crime occurred. The Greens stated that at approximately 6:00 or 7:00 p.m. on August 14, 1988, they saw a man and a woman on a dark motorcycle down by the river with a male on a yellow dirt bike and another male on a motorcycle. Mrs. Green stated that around 11:30 p.m. that night, she saw two people on a motorcycle, which she believed to be the same dark motorcycle she saw earlier, throw something into the weeds near her home. The next day, Mrs. Green retrieved two full cans of Pabst beer, one empty Pabst beer can, one full bottle of Corona beer, and one empty Corona beer bottle from the weeds.
 {¶ 88} The trial court found that Mrs. Green's statement corroborated Busta's testimony regarding the time he threw out the remnants of the beer; however, the trial court found it also fundamentally contradicted Busta's story. The trial court stated, "[i]t could have been used by defense counsel to show that Busta had lied about the location of the crime, and he may have committed the crime with two other people on motorcycles." Further, the trial court noted Mrs. Green did not see a white pick-up truck, but did see two people on a motorcycle around 11:30 p.m. dumping something into the weeds. According to Douglas, both Gondor and Resh were at the Upper Deck at 11:40 p.m.
 {¶ 89} Gondor also presented a statement given by Mr. and Mrs. Thomas ("the Thomases"), who resided on the first piece of property north of the purported scene of the homicide. They stated they did not see Busta on a motorcycle nor did they see a white pick-up at any time on the day of the homicide. The trial court stated, "[t]his report might have been used to refute Busta's story about where the offense occurred."
 {¶ 90} Levine testified he did not receive nor see this evidence. Levine stated that all of these reports would have assisted in refuting Busta's testimony and demonstrating other individuals were involved in the Nardi homicide. Levine concluded there would be no reasonable trial strategy for failing to use such reports, and he would have rendered ineffective assistance for failing to do so. We disagree.
 {¶ 91} First, the Thomases' report has no bearing on Gondor's defense and thus offers little support to Gondor's claim of ineffective assistance. The Thomases, who lived near the scene of the crime, stated they never saw Busta on his motorcycle and never saw a white pick-up truck on the day of the murder. However, the Thomases' failure to observe these vehicles does not prove Resh, Gondor, and Busta were not there at some point in the night. Therefore, the Thomases' report is at best marginally favorable. Levine was not ineffective for failing to present this evidence.
 {¶ 92} Next, evidence established Douglas provided Easthon with information regarding two other individuals who Busta may have had contact with earlier on the night of the murder. Levine did not use this report and the trial court held he could have done so to impeach Easthon's testimony as well as the credibility of the investigation. When observed in its entirety, the content of the Douglas information is vague and lacks an explicit nexus to the crime. Due to its generality, it is unclear how the Douglas statement is exculpatory. In any event, Levine specifically challenged Easthon's investigative style and its variance from police procedures. Utilizing the Douglas statement would have been redundant as Levine presented ample evidence of Easthon's suspect credibility. Gondor has failed to show how he suffered prejudice because of Levine's failure to present this cumulative evidence.
 {¶ 93} Next, the Greens stated they saw a male and a female on a dark motorcycle, another man on a motorcycle, and a third on a yellow dirt bike at approximately 6:00 p.m. or 7:00 p.m. on the night of the murder. Further, Mrs. Green indicated that, around 11:30 p.m., she saw two people on what she believed was the same dark motorcycle throw something into the weeds near her home. She later investigated and retrieved three cans of Pabst and two bottles of Corona.
 {¶ 94} The trial court determined this information would necessarily bear on the outcome of the case as Levine could have used it to show Busta had lied about the location of the crime and he may have committed the crime with two other people on motorcycles. This evidence is marginal and cumulative.
 {¶ 95} The record reflects the defense challenged the police investigation. Further, Levine's cross-examination of Busta illustrated Busta was a liar whose version of the events changed. The jury was aware of the state's credibility problems and Gondor suffered no prejudice from Levine's failure to present cumulative credibility evidence. In our view, the report is not exculpatory and even had Levine used it, its impact would be tenuous in light of Levine's attack on Easthon's and Busta's credibility.
 {¶ 96} Finally, the incident described by Sabarese has no bearing on Gondor's defense. The lower court referenced the incident, but failed to state how Levine's failure to use it prejudiced Gondor.
 {¶ 97} Hindsight may not be used to distort the assessment of what was reasonable in light of trial counsel's perspective at the time. State v.Cook (1992), 65 Ohio St.3d 516, 524-525. Levine soundly impeached Easthon's investigation and methodology by pointing out, inter alia, his deviation from proper police procedures.[8] Accordingly, Gondor suffered no prejudice from Levine's failure to use Sabarese's statement.
 {¶ 98} The above statements neither directly nor necessarily affect Gondor's defense and Gondor has failed to demonstrate how he was prejudiced by Levine's failure to use them.
 {¶ 99} Evidence impacting Busta's credibility not introduced at trial
 {¶ 100} On September 11, 1988, a police report was filed based upon Busta's mother's attempt to smuggle a knife into the Geauga County Jail for her son. The trial court found such evidence might have been used to show Busta's incriminating testimony against Gondor and Resh was motivated by his concern that his mother would face prosecution. This report was in the prosecutor's file but not utilized by the defense.
 {¶ 101} Gondor also presented evidence that Busta's sister, Joanne, fabricated a story wherein Gondor incriminated himself in the Nardi homicide. Joanne stated that, while at a Garrettsville gas station on Labor Day, September 8, 1988, she encountered Gondor who made statements regarding his participation in the homicide. Gondor maintained he was at Put-in-Bay on Labor Day. This was confirmed by Amy Zimmerman ("Zimmerman"), a woman with whom Gondor spent time that day. Zimmerman's confirmation was set forth in an October 28, 1988 report authored by Easthon. Later, Joanne Busta admitted she lied about the entire encounter at the gas station. It was established during Easthon's trial testimony that Gondor was at Put-in-Bay on Labor Day and therefore did not incriminate himself to Joanne Busta. Joanne Busta's admission of her fabrication was not presented to the jury.
 {¶ 102} Further, a transcript of an interview between Busta, his lawyers, and his investigator was introduced at the post-conviction hearing. The trial court found the transcript revealed pressure being exerted on Busta to decide on what he would tell police and Busta's initial uncertainty as to the facts of the murder. In this interview Busta denied seeing anyone strike or rape Nardi. Further, Busta indicated he did not know why Gondor and Resh were throwing wood from Gondor's truck, but stated the wood was clean, i.e., implying it was not bloodstained.
 {¶ 103} Busta's attorney asked him whether he would be willing to "set up" Resh and Gondor for Easthon. Busta replied "I'd do anything I have to do to get myself out of this. I ain't sitting in no chair for somebody else. I'm not going to sit in jail for somebody else." Busta stated that Easthon felt Resh and Gondor were involved but they only had evidence against him and would only prosecute him. At trial, Busta testified Resh and Gondor struck Nardi while Resh attempted to rape her.
 {¶ 104} At the post-conviction hearing, Dr. Richard Ofshe, an expert in police interrogations and false confessions, testified that Busta's eventual trial testimony was the culmination of pressure applied to him, information given to him, and motivations created for him that made Busta's testimony wholly unreliable.
 {¶ 105} Levine testified he never reviewed Busta's interview. He testified the interview would have been highly effective for impeaching Busta's credibility and the integrity of the investigation. Levine testified that if he had access to this information and failed to use it, he would have violated Gondor's constitutional right to effective assistance of counsel.
 {¶ 106} Gondor has failed to show he suffered prejudice because of the omission of this evidence. Levine conducted a probing cross-examination of Busta at trial. Levine elicited responses from Busta indicating Busta was a liar. Busta also revealed to the jury that he would "do what he had to do" to avoid the electric chair. Further, Busta testified he changed the versions of his story in reaction to the responses suggested by investigators. While Busta's interview demonstrated the suggestiveness of the investigation, it also demonstrated that Busta maintained through out the interview that he did not want to be punished for someone else's crimes. The only others he identified as being involved were Resh and Gondor.
 {¶ 107} The jury was well aware of Busta's penchant for lying and changing his story. Therefore, Levine's omission of the interview did not prejudice Gondor as it merely underscored Busta's credibility problems; problems of which the jury was well aware; and emphasized Busta's testimony that Resh and Gondor committed the crimes.
 {¶ 108} Gondor also challenged Levine's failure to attack Busta's credibility with evidence of Kay Busta's attempt to smuggle a knife to her son while he was in jail. The trial court's conclusion that Levine could have used this report to show Busta's testimony was motivated by an interest in saving his mother from prosecution is wholly speculative. Nothing in the record indicates Busta cooperated with the state so that his mother might avoid prosecution. In fact, the fifty-page interview, discussed above, occurred on September 14, 1988, three days after the report was filed against Busta's mother. It is equally likely that if the police were interested in inducing Busta's cooperation through a promise his mother would not be prosecuted, such discussions would have occurred during the interview. There is no such indication.
 {¶ 109} In any event, the evidence of the police report relating to Kay Busta's goes to Busta's credibility. As we discussed, Gondor's counsel severely attacked Busta's credibility at trial. The record reveals Busta was portrayed as a very desperate man whose version of facts differed virtually every time he gave a statement to anyone involved in the investigation. In spite of this, the jury still chose to believe him. Levine was not ineffective for failing to raise every conceivable piece of evidence relating to Busta's credibility. Thus, Gondor has not demonstrated he was prejudiced by the omission of this cumulative evidence.
 {¶ 110} Gondor also contends evidence of a fabricated statement made by Joanne Busta was never presented to the jury and its omission prejudiced his ability to defend himself. That is, at trial evidence was presented that Joanne Busta filed a report wherein she alleged Gondor made incriminating statements to her regarding the Nardi homicide. However, on cross examination, Easthon testified the report could not be true as Gondor was at Put-n-Bay the day he allegedly made the statement. Easthon verified Gondor's whereabouts and the jury heard this evidence. Thus, the omission of evidence regarding Joanne Busta's fabrication was harmless as the jury heard evidence undermining its credibility at trial.
 {¶ 111} Conclusion
 {¶ 112} At the post-conviction hearing, Levine characterized his own assistance as ineffective. However, the sole criterion of effectiveness is not acquittal. See, State v. Hunt (1984), 20 Ohio App.3d 310. A properly-licensed attorney is presumed competent. Vaughn v. Maxwell
(1965), 2 Ohio St.2d 299, 301. Any questions regarding the ineffectiveness of counsel must be viewed in light of the evidence against the defendant with a strong presumption that counsel's conduct is within the broad range of professional assistance. See, e.g., State v.Bradley (1989), 92 Ohio St. 3d 136, 142-143. Gondor has failed to rebut this presumption.
 {¶ 113} Levine's cross-examinations of Easthon and Busta revealed the inherent credibility problems within the state's case. Notwithstanding these problems, the jury believed Busta, trusted Easthon's investigation, and convicted Gondor. Although it is obvious that a defense attorney whose client is convicted would act differently if given a second chance, such hindsight does not mean the defendant received ineffective assistance of counsel. Even if Levine should have included the information gleaned from the evidence presented at the post-conviction hearing, Gondor has failed to demonstrate he suffered prejudice as a result. That is, notwithstanding the omission of the evidence discussed, the original jury verdict is reliable and worthy of confidence.
 {¶ 114} We, therefore, hold Gondor did not receive ineffective assistance of counsel. The state's second and third assignments of error have merit.
 {¶ 115} For the foregoing reasons, the state's assignments of error are sustained. Thus, the judgment of the Portage County Court of Common Pleas granting Gondor post-conviction relief is reversed.
Degenaro, J., Seventh Appellate District, sitting by assignment, concurs,
O'Neill, J., dissents with Dissenting Opinion.
[1] Gondor was acquitted of attempted rape.
[2] Resh's attorney, James Owen, Chairman of the Ohio Public Defender's Commission, worked closely with Gondor's attorneys — the public defender's office, during the discovery process and through the commencement of the joint post-conviction hearing. Busta sought to intervene to protect privileged information from being disclosed by the Ohio public defender's office, which had represented Busta.
[3] Holcomb was an employee of Domino's.
[4] The employee who answered the phone was unable to remember the specific day. At trial, Gondor's phone records demonstrated the only call from his phone to Domino's was made Thursday, August 18, 1988, the day Easthon interviewed him.
[5] Resh was contacted and interviewed by Easthon on August 17, 1988 regarding the Nardi homicide. As such, if Resh and Gondor were confirming their whereabouts for the night of the murder before August 17, such evidence would support the state's "false alibi" theory.
[6] As we discuss infra, Laux made explicit reference to the Wraxall report during Levine's cross-examination. However, after a brief sidebar discussion off the record, Levine went forward with his cross without further inquiry into the contents of the SERI report.
[7] As indicated in our analysis of the state's first assignment of error, Gondor cannot base an ineffective assistance of counsel claim on evidence that did not exist. The 1991 letter and 1996 affidavit from Wraxall and the April 30, 2001 deposition did not exist at the time of the trial. Thus, the trial court erred when it relied on Wraxall's 1996 testimony indicating the stains were not blood, but "* * * more likely perspiration."
[8] In particular, Levine challenged Easthon's investigation style, attacked his failure to conduct microscopic analyses of Gondor's truck, and his failure to record Gondor's interview.